# Supreme Court of Florida

_____

No. SC15-2127
_____

**S.M., etc.**,
Petitioner,

vs.

**FLORIDA DEPARTMENT OF CHILDREN AND FAMILIES, et al.**,
Respondents.

[September 1, 2016]

PARIENTE, J.

This case involves what is constitutionally required before terminating the parental rights to children. Recognizing that parents have a fundamental liberty interest in being a parent to their children, this Court has required that, as part of a parent's constitutional rights, the termination of parental rights be the "least restrictive means" of protecting the child from harm. Padgett v. Dep't of Health & Rehab. Servs., 577 So. 2d 565, 571 (Fla. 1980). The mother of three minor children, while conceding that the grounds for termination of parental rights had been met and that reunification would be harmful to the children, asserts that the

trial court should have considered permanent guardianship or some other arrangement rather than termination of her parental rights.[1]

The specific issue we address, based on a certified conflict between the Fourth District's opinion in S.M. v. Florida Department of Children & Families, 190 So. 3d 125 (Fla. 4th DCA 2015), and the First District's opinion in C.D. v. Florida Department of Children & Families, 164 So. 3d 40 (Fla. 1st DCA 2015), is whether, under the least restrictive means prong enunciated in Padgett, the trial court is required to consider a permanent guardianship rather than adoption in order to preserve the parent-child bond and allow the parent to have continued contact with the child, after the grounds for termination of parental rights have been established and the court has determined that reunification with the parent would be harmful to the child.[2]  As the Fourth District Court explained, the focus of the "least restrictive means" prong is whether the parent has the ability to be a parent to the child with all of the responsibilities that it entails and "not merely to be an occasional presence in the life of the child."  S.M., 190 So. 3d at 128.

---

1. As set forth in the trial court's order, the rights of the biological fathers are not at issue because their rights were terminated.

2. The mother and identified fathers were appointed attorneys to represent them throughout the proceedings.  The children were appointed a guardian ad litem, although they were not represented by an attorney.

We agree with the conclusion of the Fourth District, which is also advanced by the Department of Children and Families (DCF) and the Guardian Ad Litem program (GAL). The least restrictive means prong does not require the trial court to consider a permanent guardianship, instead of adoption, after the grounds for termination have been established by clear and convincing evidence and reunification would not be in the manifest best interests of the child. Not only would this option be contrary to legal precedent, but it would also be contrary to the legislative scheme. Section 39.621, Florida Statutes (2016), specifies that permanent guardianship shall be considered only after reunification and adoption are not available options.

Accordingly, we approve the decision of the Fourth District in S.M. and disapprove the decision of the First District in C.D, to the extent that it could be read as prohibiting termination of parental rights if there is any emotional bond between the parent and child and there is another permanency option, such as guardianship, that would protect the child from harm.[3]

---

3. S.M. also briefed two additional issues: (1) whether the trial court erred in allowing the testimony of mental health expert, Dr. Garma, under the Gen. Elec. Co. v. Joiner, 522 U.S. 136 (1997), standard, and (2) whether the trial court erred in adopting the proposed judgment of the Department of Children and Families as its final judgment. We decline to address these issues as they are outside the scope of the certified conflict jurisdiction. See Campbell v. State, 125 So. 3d 733, 734 n.1 (Fla. 2013) (declining to address issue beyond the basis of the Court's conflict

# FACTS

The Fourth District set forth the material facts in the underlying termination of parental rights trial that demonstrate the extensive efforts made by DCF to reunify the mother with her children before it filed a petition to terminate parental rights:

> The mother had three children, born in 2007, 2008, and 2010. Her last child tested positive for drugs when born, and a case manager for a volunteer agency came to work with the mother and provide a voluntary services plan for the mother. The plan included random drug tests and counselling, and the recommendation that she obtain employment, housing, and child care. The mother did not comply with any of the recommendations. The case manager also observed that one of the children had decayed teeth and needed dental work, but the mother did not follow through on making any appointment to have the necessary work done. Despite repeated visits from the case manager, the mother never complied with any of the tasks in the voluntary case plan, other than going once for a drug test which proved positive for marijuana. The mother moved several times without telling the case manager where she was moving. When the case manager finally found her in a home under construction and containing hazards to the children, the case manager filed an abuse report with DCF.
>
> DCF first filed a shelter petition for the children and later filed a dependency petition. Ultimately, it placed the two older children in the care of the mother's great-aunt and the youngest child with the mother's cousin. After the children were adjudicated dependent in February 2012, a case plan was developed for the mother which required her to have drug treatment and to obtain stable housing and a job. The mother made no effort to complete any of her case tasks. In fact, she explicitly refused to comply with drug screening and counselling. She admitted to using marijuana on a regular basis and

jurisdiction); Paulucci v. Gen. Dynamics Corp., 842 So. 2d 797, 803 n.6 (Fla. 2003) (declining to address issues outside of the scope of the certified jurisdiction).

essentially saw nothing wrong with it. She did not visit with the children on a regular basis. The mother also routinely missed court hearings.

When her great-aunt became ill, the mother moved back to the area and assisted with the children for a while. Nevertheless, she continued to be non-compliant with drug testing as well as with finding stable housing and a job. Finally, in June 2013, the mother agreed to seek drug treatment. However, she was not compliant with court-ordered drug screening. When she was screened, she continually tested positive for marijuana. She did not successfully complete the drug treatment.

Unfortunately, the great-aunt suffered a stroke and died in March 2014. The cousin then took custody of the two children who had previously been in the great-aunt's care. The case manager noted that the children reacted positively with the mother and clearly loved her, but they were very attached to the cousin as their caregiver. After the death of the great-aunt, DCF filed a petition to terminate the rights of the mother.

In July 2014, the case manager tried again to get the mother in for drug screening and treatment. Finally, a bed opened up in a treatment facility. But when the mother was told that the treatment could take up to six months, she refused to participate and told the case manager that DCF "could make other arrangements for her children to be adopted."

At the final hearing on termination, in addition to the testimony of case managers as to the mother's complete failure to comply with any case plan tasks despite years of assistance, a psychologist testified that the mother had a narcissistic personality disorder, which meant that she put her own needs and desires above those of the children. This was evidenced in her refusal to obtain drug treatment as well as in failing to find a job or do any work. The psychologist did not recommend that the children be placed with the mother.

The cousin, who had custody of all three children, acknowledged that the mother helped out on occasion with the children and was the "primary babysitter" for the youngest child when the cousin would work. However, the mother had also moved away recently and saw the children infrequently. The cousin loves the children and wants to adopt them. She would allow the mother continued contact because the children know her. She reported that the children love their mother, and "if [the mother's] situation was

different and she could, you know, have her own place and was stable, it would be a good thing [for the children] to be with her, but that's not the case."

At the close of the hearing, the mother's counsel argued against termination of parental rights and maintained that the evidence showed that the mother had a good relationship with her children and could rehabilitate herself if given more time and that termination was not the least restrictive means of preventing harm to the children. The court requested proposed judgments from each party, which were circulated to the parties.

The court adopted DCF's proposed final judgment and terminated the mother's parental rights. In the final judgment, the court found that the mother had made essentially no effort to comply with the case plan. When the children were removed from her because of her transient, unstable lifestyle, she made no effort to improve and remained unstable. Her drug use continued unabated, and she spent whatever money she had on drugs and not on her children. The court found no reasonable basis to think that the mother would improve if given more time, as she had failed to show any progress in over three years. The court concluded that DCF had proven grounds for termination as well as that termination was in the manifest best interest of the children.

S.M., 190 So. 3d at 126-28.

S.M. challenged whether termination of parental rights was the least restrictive means even while conceding that grounds for termination of parental rights had been met. S.M. relied primarily on the evidence of her loving bond with her children. She further cited the placement of her children with her cousin, who would allow S.M. to visit and babysit the children. Id. at 127. S.M. argued that, under the circumstances of her case, termination was not warranted and relied on the First District's opinion in C.D. Id. at 129.

- 6 -

In C.D., the First District held that because the children in that case had a positive bond with their parents and their placement with a relative allowed the children continued contact with the parents, termination of the parents' rights was not the least restrictive means. 164 So. 3d at 44. The Fourth District disagreed with the First District's interpretation of the least restrictive means prong, holding that the prong was not about "whether, under controlled circumstances, a parent can have contact with the child and develop an emotional bond, but whether a mother . . . can be a parent to the child, with all of the responsibility and care that entails." S.M., 190 So. 3d at 129. Rather, once the "constitutional test for termination of parental rights was met . . . the court was not required to consider a permanent guardianship." Id. at 126. The Fourth District certified conflict with C.D.

In accordance with Florida Rule of Appellate Procedure 9.146(h), this case has been expedited by the Court because it involves termination of parental rights.

## ANALYSIS

In this case, we clarify the meaning of the "least restrictive means" prong that the State must satisfy before a parent's rights are terminated. S.M. concedes that DCF has proven one of the statutory grounds for termination of parental rights to all of her children under section 39.806 by clear and convincing evidence. She also does not contest that termination of her parental rights would be in the

manifest best interests of the children, under the considerations required by section 39.810. She argues only that termination of her liberty interest in being a parent to her children is not the least restrictive means to protect her children from harm. The mother misunderstands the purpose of the least restrictive means prong.

Focusing on the third prong of the termination of parental rights test, our analysis will first examine the process for the termination of parental rights provided for in an extensive statutory scheme, then turn to an explanation of the least restrictive means prong of the termination of parental rights test, followed by a discussion of the conflict case. Finally, we will address the legislative intent and policy in this area, concluding that the Fourth District's interpretation in S.M. is more consistent with the nature of the fundamental liberty interest in being a parent to one's child as well as the Legislature's permanency goals in dependency and termination of parental rights proceedings.

**Dependency and Termination of Parental Rights Proceedings in Florida**

There is a multi-step process set forth in the statutory scheme and case law of this State before parental rights can be terminated in deference to the important constitutional rights of the parents at stake. The process begins with a shelter petition and then, if the child is sheltered, a petition for dependency and a determination by the trial court of dependency if warranted under the facts of the case. Specifically, the Florida Statutes lay out the process in great detail, from the

initial child protective services investigation (section 39.301), the shelter hearing (section 39.401), the adjudication of dependency (section 39.501), the case plan (section 39.6011), and finally the permanency determination (section 39.621) and the termination of parental rights (section 39.801).

The Florida Rules of Juvenile Procedure governing Dependency and Termination of Parental Rights Proceedings also specify in detail the procedures for effectuating the legislative scheme beginning with the Shelter Petition (Rule 8.305), the Dependency Petition (Rule 8.310), the Case Plan (Rules 8.400, 8.401 and 8.410), and finally the Termination of Parental Rights Petition (Rule 8.500). Judicial reviews are provided for by statute, section 39.701, and embedded throughout the process (Rule 8.415).

For termination to occur, section 39.806, Florida Statutes, requires that the trial court find by clear and convincing evidence that one or more of the grounds for termination under the section has been established. § 39.802(4)(a), Fla. Stat. (2016). In pertinent part, the relevant grounds are:

> When the parent or parents engaged in conduct toward the child or toward other children that demonstrates that the continuing involvement of the parent or parents in the parent-child relationship threatens the life, safety, well-being, or physical, mental, or emotional health of the child irrespective of the provision of services. Provision of services may be evidenced by proof that services were provided through a previous plan or offered as a case plan from a child welfare agency.

§ 39.806(1)(c), Fla. Stat. (2016).

In most cases, before termination of parental rights is considered, the first step in the proceedings is an adjudication of dependency, and once the children are adjudicated dependent, the parent is ordinarily given the opportunity to comply with a case plan. See § 39.6011, Fla. Stat. (2016) (requiring DCF to prepare a draft of the case plan for each child receiving services under this chapter). However, if the parent cannot succeed in complying with the case plan, the statute provides, in pertinent part:

> (e) When a child has been adjudicated dependent, a case plan has been filed with the court, and:
>> 1. The child continues to be abused, neglected, or abandoned by the parent or parents. The failure of the parent or parents to substantially comply with the case plan for a period of 12 months after an adjudication of the child as a dependent child or the child's placement into shelter care, whichever occurs first, constitutes evidence of continuing abuse, neglect, or abandonment unless the failure to substantially comply with the case plan was due to the parent's lack of financial resources or to the failure of the department to make reasonable efforts to reunify the parent and child.

§ 39.806(e), Fla. Stat. (2016).

Second, Florida Statutes also require that the trial court shall consider "the manifest best interests of the child" by evaluating the relevant factors listed under section 39.810, Florida Statutes. § 39.802(4)(c), Fla. Stat. (2016). Pursuant to section 39.810, these factors include:

> (1) Any suitable permanent custody arrangement with a relative of the child. However, the availability of a nonadoptive placement with a relative may not receive greater consideration than

any other factor weighing on the manifest best interest of the child and may not be considered as a factor weighing against termination of parental rights. If a child has been in a stable or preadoptive placement for not less than 6 months, the availability of a different placement, including a placement with a relative, may not be considered as a ground to deny the termination of parental rights.

(2) The ability and disposition of the parent or parents to provide the child with food, clothing, medical care or other remedial care recognized and permitted under state law instead of medical care, and other material needs of the child.

(3) The capacity of the parent or parents to care for the child to the extent that the child's safety, well-being, and physical, mental, and emotional health will not be endangered upon the child's return home.

(4) The present mental and physical health needs of the child and such future needs of the child to the extent that such future needs can be ascertained based on the present condition of the child.

(5) The love, affection, and other emotional ties existing between the child and the child's parent or parents, siblings, and other relatives, and the degree of harm to the child that would arise from the termination of parental rights and duties.

(6) The likelihood of an older child remaining in long-term foster care upon termination of parental rights, due to emotional or behavioral problems or any special needs of the child.

(7) The child's ability to form a significant relationship with a parental substitute and the likelihood that the child will enter into a more stable and permanent family relationship as a result of permanent termination of parental rights and duties.

(8) The length of time that the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.

(9) The depth of the relationship existing between the child and the present custodian.

(10) The reasonable preferences and wishes of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.

(11) The recommendations for the child provided by the child's guardian ad litem or legal representative.

§ 39.810, Fla. Stat. (2016).

Finally, because parents have a fundamental liberty interest in being a parent to their children, constitutional principles and case law require that DCF demonstrate that some action short of termination of parental rights could have been undertaken by the State before filing a petition to terminate the parent's right, indicating that termination is the least restrictive means of protecting the child from harm. Padgett, 577 So. 2d at 570. It is the interpretation of the "least restrictive means" prong that is our focus.

## Least Restrictive Means Prong

Termination of parental rights cases are necessarily centered on the fundamental liberty interest in being a parent to a child. See Santosky v. Krammer, 455 U.S. 745, 753, 787 (1982); Padgett, 577 So. 2d at 570. In discussing this fundamental right, the United States Supreme Court has stated:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs.

Santosky, 455 U.S. at 753. Likewise, this fundamental right is equally as strong, if not stronger, under the Florida Constitution. This Court, in Padgett, explained: "Florida courts have long recognized this fundamental parental right . . . 'to enjoy

- 12 -

the custody, fellowship and companionship of [their] offspring. This rule is older than the common law itself.' " 577 So. 2d at 570 (quoting State ex rel. Sparks v. Reeves, 97 So. 2d 18, 20 (Fla. 1957)).

Yet the constitutional right to be a parent without state interference is not unlimited. The right to be a parent carries with it important responsibilities to be able to care for one's children without causing them serious harm. Specifically, "the only limitation on this rule of parental privilege is that as between the parent and the child the ultimate welfare of the child must be controlling." Id. (quoting Sparks, 97 So. 2d at 20). The parent's rights are subject to the overriding principle that it is the ultimate welfare and the best interests of the children that must prevail. Id.

The least restrictive means prong of the termination of parental rights test is tied directly to the due process rights that must be afforded to a parent before his or her parental rights are terminated and is intended to protect the rights of both the parent and the child. This prong focuses specifically on what actions were taken by the State before filing a petition to terminate the parent's rights. "When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." Santosky, 455 U.S. at 753. As this Court has stated:

> To protect the rights of the parent and child, we conclude that
> before parental rights in a child can be permanently and involuntarily

- 13 -

severed, the state must show by clear and convincing evidence that reunification with the parent poses a substantial risk of significant harm to the child. Implicit in this standard is the basic requirement that, under ordinary circumstances, the state must show that the parent abused, neglected or abandoned a child.

Padgett, 577 So. 2d at 571 (footnote omitted).

The determination of the least restrictive means must be evaluated in light of the right being terminated: to be a parent to one's child. Consideration of this prong is all the more critical in the extraordinary case, where DCF does not offer the parent the chance to comply with the requirements of a case plan and be reunited with his or her child and, instead, moves to terminate the parent's rights to the child based on the parent's abuse or neglect of a different child. Id. at 571.

This Court has made clear that the least restrictive means prong is implicit in Florida's statutory scheme based on the Court's obligation to construe statutes in a constitutional manner. Fla. Dep't of Children & Families v. F.L., 880 So. 2d 602, 609 (Fla. 2004). To satisfy the least restrictive means prong, DCF must "ordinarily" prove that before it files a petition to terminate the parent's rights, DCF made a "good faith effort to rehabilitate the parent and reunite the family." Padgett, 577 So. 2d at 571. In most cases, where DCF is not moving directly from sheltering the child to seeking termination of the parent's rights, as occurred in Padgett, this prong is generally satisfied by DCF offering the parent a case plan and providing the parent with the help and services necessary to complete the case

plan.  Id.  The least restrictive means prong, which is derived from Padgett, "is not intended to preserve a parental bond at the cost of a child's future.  Rather . . . it simply requires that measures short of termination should be utilized if such measures can permit the safe re-establishment of the parent-child bond."  Fla. Dep't of Children & Families v. B.B., 824 So. 2d 1000, 1009 (Fla. 5th DCA 2002).

**Conflict Case**

In the conflict case, C.D., the children were removed from their mother and placed in foster care with their mother's sister.  164 So. 3d at 41.  A psychologist testified that although the children were not harmed by weekly visits with the mother, reunification would pose a significant risk of harm to the children's wellbeing.  Id.  There was also testimony that even though the parents had a bond with the children, terminating parental rights would not harm the children because the maternal aunt wished to adopt the children and would allow continued contact with the mother.  Id.  The First District found that the State failed to prove that termination was the least restrictive means to protect the children from harm because of inconsistencies in the evidence presented.  Id. at 44.  The First District, held that "DCF failed to establish that TPR [termination of parental rights], as opposed to some other arrangement, is the least restrictive means of protecting the children from harm.  This conclusion is based on the testimony that it was safe for the children to have supervised contact with Appellant, as well as the GAL's own

- 15 -

assessment that TPR would not harm the children despite their bond with Appellant, because the prospective adoptive aunt would allow such contact." Id. at 43 n.1.

**Proper Interpretation of the Least Restrictive Means Prong**

S.M. argues that C.D. stands for the proposition that where a stable, long-term placement with a family relative is available that poses no risk of harm by the parent to her children and there is a strong parent-child bond, termination of parental rights should be rejected in favor of this other alternative placement. She contends that C.D. requires the consideration of the nurturing bond between parent and child in any least restrictive means analysis. The trial court must decide whether some avenue short of the evisceration of the parent-child bond could foster the reestablishment of the parent-child bond. S.M. contends that when there is no risk to the child's safety, an alternative, long-term placement with a relative is more appropriate than termination of parental rights. We reject this argument.

First and importantly, the First District clarified its holding in C.D. in Fla. Department of Children & Families v. B.C., 185 So. 3d 716 (Fla. 1st DCA 2016), stating:

> The Court in C.D. specifically disclaimed that its decision could be interpreted to mean that termination of parental rights is precluded because there is some connection or bond between the children and their mother and there may be some future supervised contact between the mother and the children. Instead, on the specific facts in the case, this Court found that the Department failed to establish that

[termination], as opposed to some other arrangement, is the least restrictive means of protecting the children from harm.

Id. at 719-20 (citing Statewide Guardian Ad Litem Program v. A.A., 171 So. 3d 174 (Fla. 5th DCA 2015)) (internal quotations omitted).  Indeed, the First District in B.C. noted the uniformity of judicial precedent rejecting the notion that termination is impermissible under the least restrictive means prong "simply because some limited and highly restricted contact with a parent may pose no harm."  Id. at 720.  In light of this clarification, it is clear that not even the First District would embrace as expansive of a reading of C.D. as S.M. asserts in this case.  The First District made clear in B.C. that C.D. was based on the specific facts in that case and on the inconsistencies of the testimony presented, not on consideration of the bond between the parent and children.

Next, even if S.M.'s characterization of C.D.'s holding were accurate, the Fourth District's interpretation of the least restrictive means prong more faithfully articulates the appropriate considerations to be taken into account when analyzing the least restrictive means prong of the termination of parental rights test.  The Fourth District described the conflict between the two opinions as follows:

> We think C.D.'s interpretation of the least restrictive means test is contrary to Padgett.  The test is not whether, under controlled circumstances, a parent can have contact with the child and develop an emotional bond, but whether a mother or father can be a parent to the child, with all of the responsibility and care that entails.  If reunification is not possible because the father or mother cannot or will not assume responsibility as a parent to the child, as

- 17 -

demonstrated, for example, by the repeated failure to comply with a case plan, then termination is the least restrictive means of preventing harm.

S.M., 190 So. 3d at 129.

As DCF and GAL note, this interpretation of the least restrictive means prong properly puts the focus on the State's actions prior to filing the termination of parental rights petition, rather than on the consideration of what remains of the bond between parent and child. In adhering to the reason behind the least restrictive means analysis and to ensure that parents are afforded due process before their fundamental right is terminated, the Fourth District correctly analyzed whether some action, apart from termination, could have been undertaken by the State prior to filing the petition to terminate the parent's rights that would have preserved the parent-child bond and still protected the child from harm. This interpretation, as opposed to the interpretation of the First District in C.D. that S.M. alleges, appropriately considers the process due and the parental right being terminated—the right to be a parent to one's child—rather than focusing on the bond between the parent and child. This interpretation is also consistent with the views of the other appellate courts:

> Although the children were placed with a relative, the availability of relative placement does not mean that termination of the mother's parental rights is not the least restrictive means of preventing harm. Courts have frequently determined that the availability of a relative placement is not the dispositive consideration under the least restrictive means test. See In re Z.C., 88 So. 3d 977

- 18 -

(Fla. 2d DCA 2012); <u>S.S. v. Dep't of Children & Family Servs.</u>, 891 So. 2d 1068, 1070 (Fla. 2d DCA 2004); <u>R.L. v. Dep't of Children & Families</u>, 955 So. 2d 1240 (Fla. 5th DCA 2007); <u>see also</u> <u>N.S. v. Dep't of Children & Families</u>, 36 So. 3d 776, 779 (Fla. 3d DCA 2010) (holding that "[t]he existence of possible placement with a relative is irrelevant to the least [restrictive] means test, where DCF made reasonable [but unsuccessful] efforts to rehabilitate the Mother and provide services to her and her children with the goal of reuniting them as a functional family").

<u>S.M.</u>, 190 So. 3d at 129.

In termination of parental rights cases, consideration of the bond between the parent and child and the best permanency decision for the child is appropriate and relevant in an analysis of the second prong of the termination of parental rights test, which requires the trial court to consider the manifest best interests of the child by evaluation of the relevant factors listed under section 39.810, Florida Statutes. Some of those factors listed include:

> (1) Any suitable permanent custody arrangement with a relative of the child. However, the availability of a nonadoptive placement with a relative may not receive greater consideration than any other factor weighing on the manifest best interest of the child and may not be considered as a factor weighing against termination of parental rights. If a child has been in a stable or preadoptive placement for not less than 6 months, the availability of a different placement, including a placement with a relative, may not be considered as a ground to deny the termination of parental rights.
>
> . . .
> (5) The love, affection, and other emotional ties existing between the child and the child's parent or parents, siblings, and other relatives, and the degree of harm to the child that would arise from the termination of parental rights and duties.

. . .

> (9) The depth of the relationship existing between the child and the present custodian.

§ 39.810, Fla. Stat. (2016). Therefore, to require consideration of the bond between the parent and child in the third prong of the test, the least restrictive means prong, would be unnecessarily duplicative and confuse the purpose of that prong: to ensure that the parent is afforded due process by the State before his or her fundamental right to be a parent to his or her children is terminated.

The Fourth District's interpretation is also more consistent with the Legislature's permanency goals in dependency cases. The Legislature has clearly stated its preference of permanency options for children in the dependency system in section 39.621, Florida Statutes:

> (2) The permanency goals available under this chapter, <u>listed in order of preference</u>, are:
>
> (a) Reunification;
> (b) Adoption, if a petition for termination of parental rights has been or will be filed;
> (c) Permanent guardianship of a dependent child under s. 39.6221;
> (d) Permanent placement with a fit and willing relative under s. 39.6231; or
> (e) Placement in another planned permanent living arrangement under s. 39.6241

<u>Id.</u> §§ 39.621(2)(a)-(e) (emphasis added).

Only after the trial court determines that adoption or reunification would not be in the best interests of the child may DCF consider "some other arrangement."

- 20 -

Section 39.6221, specifically states: "[i]f a court determines that reunification or adoption is not in the best interest of the child, the court may place the child in a permanent guardianship with a relative or other adult approved by the court." Id. § 39.6221(1).

The Legislature has also made clear that "[t]ime is of the essence" in providing permanency for children requiring that, if possible, children should be placed in a permanent living situation within one year of coming into care. § 39.621(1), Fla. Stat. Timeliness is also mandated by the federal government. See 42 U.S.C. § 671(a)(15)(C) (2015) (requiring that reasonable efforts shall be made to place the child in a timely manner in accordance with the permanency plan); see also 42 U.S.C. § 675(5)(C) (2015) (requiring a permanency hearing to be held, no later than twelve months after the date the child is considered to have entered foster care).

The position advocated by S.M. runs contrary to these goals. First, S.M. states that if the children have a bond with the parents, then children should continue to remain involved in the state dependency system through a permanent guardianship, so long as they are in a long-term placement and are not being harmed. When a person is appointed the permanent guardian of the child, the court retains jurisdiction over the case, and the permanency determination can be modified at any time upon court approval. See § 39.6221(5), Fla. Stat. (2016). A

permanent guardianship does not terminate the parent-child relationship. § 39.6221(6), Fla. Stat. Second, S.M. also advocates that "some other arrangement," as opposed to termination of rights and adoption, should be the preferred permanency goal. Both of these arguments shift the focus of the termination of rights hearing away from the best interests of the child to the parent's interests in preserving the parent-child bond.

While the Court and the Legislature understand the importance of the parent-child bond, that is the very reason that all efforts are made before termination of parental rights occurs to assist the parent in being able to parent his or her child and protect his or her child from harm. The "right" of a parent to a bond with the child is important, but ultimately the health, welfare, and safety of the child must be paramount. Being a parent requires parental obligations to care for the child, specifically to ensure the child's life, safety, well-being, and physical, mental, and emotional health. See § 39.806(c), Fla. Stat. (2016).

Contrary to S.M.'s assertion, termination of parental rights does not always end in eviscerating the bond between the parent and child forever. In looking at the best interests of the child, the Legislature has left open the possibility of allowing continued visitation between a biological parent and child after the parent's rights have been terminated. See § 39.811(7)(b), Fla. Stat. (2016); Fla. Dep't of Children & Family Servs. v. A.D., 904 So. 2d 480, 482 (Fla. 1st DCA

2005) (holding "the termination of parental rights does not necessarily mean that all bonds are broken between parent and child. A court may allow some continued communication between the parent and children pending adoption, and even after adoption, if it determines that such contact is in the children's best interest.") These options could alleviate any concern of harm caused to the child from the termination of the parent-child bond and still allow the child to achieve permanency in a timely fashion.

Finally, there is a strong policy incentive in achieving permanency for children in care as quickly as possible. This is clear in the Legislature's statutory requirement that "[t]ime is of the essence" in dependency cases. § 39.621(1), Fla. Stat. (2016) (stating that "[t]ime is of the essence for permanency of children in the dependency system"). Indeed, the United States Supreme Court and this Court have recognized this as well. This Court has explained, "[t]imely disposition of ineffective assistance of counsel claims is essential in light of the harm to the child that results when permanency is unduly delayed." J.B. v. Fla. Dep't of Children & Families, 170 So. 3d 780 (Fla. 2015). The United States Supreme Court has also stated:

> The State's interest in finality is unusually strong in child-custody disputes. The grant of federal habeas would prolong uncertainty for children . . . , possibly lessening their chances of adoption. It is undisputed that children require secure, stable, long-term, continuous relationships with their parents or foster parents. There is little that can be as detrimental to a child's sound

- 23 -

development as uncertainty over whether he is to remain in his current "home," under the care of his parents or foster parents, especially when such uncertainty is prolonged.

Lehman v. Lycoming Cty. Children's Servs. Agency, 458 U.S. 502, 513-14 (1982). The least restrictive means analysis advocated by S.M. would allow children to stay in care indefinitely, so long as they maintained a bond with their parents and were not being harmed, which is in direct opposition to the children's need for permanency.

**This Case**

Clearly, this case is not about whether S.M. is or should be a "model parent[]." Padgett, 577 So. 2d at 570. Both the Fourth District's opinion and the trial court's 43-page order detail the efforts that were made to assist the mother with her obligations to be a parent to her children and protect their welfare.

The three children were born in 2007, 2008, and 2010, and the last child tested positive for drugs at birth. The State did not intervene initially, but a case manager for a volunteer agency came to work with the mother and provide a voluntary services plan for the mother. That plan included random drug tests and counselling and the recommendation that she obtain employment, housing and child care.

As the Fourth District's opinion details, despite repeated visits from her case manager, the mother never complied with the tasks and changed residences several

times without notifying the case manager. Only after the case manager determined there were hazards in the mother's choice of housing, a home under construction, did the case manager file an abuse report with DCF. From the time the children were sheltered in March of 2011 and the dependency petition filed in April of 2011 until the petition for termination of parental rights was filed, two and a half years elapsed. The trial on the termination of parental rights did not occur until April of 2015.

The efforts made by DCF are detailed in the trial court's order:

> The children were taken into protective custody on March 18, 2011, due to the mother's severe neglect of R.H., her substance abuse, and her transient lifestyle which lead to instability for the children. At the time, the mother was leaving her two young boys alone when she went out at night. These behaviors threatened the children's life, safety, and health. The Department made efforts to prevent removal by establishing safe living arrangements for the mother and her children and offering services to address the mother's substance abuse and lack of supervision of her children. The mother did not avail herself of these services; rather, she made excuses and claimed to be too busy to take advantage of the services. After the children were removed, the mother's behavior did not change. She continued to live a transient lifestyle; she continued to use marijuana and failed to submit to random drug screens; she failed to follow through with substance abuse treatment. Substance abuse treatment has consistently been made available to this mother over the past four years. During this time the mother has attended only three months of treatment before being discharged. She never completed treatment. The mother was placed on the drug hotline and failed to submit to random drug screens. Every drug screen this mother has completed, over the past four years, had been positive for THC, the active ingredient in cannabis i.e. marijuana. At this point there is no reasonable basis to believe the mother will improve.

The trial court found that DCF had established three grounds for termination of S.M.'s right to all three children pursuant to section 39.806, Florida Statutes, by clear and convincing evidence: (1) section 36.806(1)(c), continuing involvement of the parent in the parent-child relationship threatens the life, safety, well-being, or physical, mental, or emotional health of the child irrespective of the provision of services; (2) section 39.806(1)(e), parent's failure to complete or substantially comply with the case plan for a period of 12 months, parent's material breach of the case plan, and child has been in care for any 12 of the last 22 months and the parents have not substantially complied with the case plan; and (3) section 39.806(1)(j), parent has a history of extensive, abusive, and chronic use of a controlled substance which renders her incapable of caring for the children, and has refused or failed to complete available treatment for such use during the three-year period immediately preceding the filing of the petition for termination of parental rights. S.M., 190 So. 3d at 129. It also found that termination was in the manifest best interests of the children under section 39.810, Florida Statutes, and that reunification with S.M. would pose a substantial risk of harm to all three of her children. Id.

As the uncontroverted facts in the record show, DCF made good faith efforts over a four-year period to work toward reunification by offering the mother three case plans. Despite DCF's efforts, the mother has "no commitment to treatment"

- 26 -

for her drug problem and has shown a "pervasive pattern of putting herself first." In the two years following her children's removal, S.M. never passed a drug screening, nor did she successfully complete any drug treatment program. DCF has more than satisfied its burden under the least restrictive means test in this case. The children are entitled to permanency.

## CONCLUSION

"While we are loath to sanction government interference in the sacrosanct parent-child relationship, we are more reluctant still to forsake the welfare of our youth. Florida's children are simply too important." Padgett, 577 So. 2d at 571. We conclude that the Fourth District's interpretation is more consistent with the nature of the fundamental right to be a parent to one's child as well as the Legislature's permanency goals in dependency and termination of rights proceedings. Accordingly, based on the analysis above, we approve the decision of the Fourth District in S.M. and disapprove the decision of the First District in C.D. to the extent that it could be read as prohibiting termination of parental rights if there is any emotional bond between the parent and child and there is another permanency option, such as guardianship, that would protect the child from harm. This case is remanded to the Fourth District on an expedited basis to ensure that the final judgment of adoption is finalized by the trial court.

It is so ordered.

LABARGA, C.J., and LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Application for Review of the Decision of the District Court of Appeal - Certified Direct Conflict of Decisions

      Fourth District - Case No. 4D15-2186

      (St. Lucie County)

Antony Parker Ryan, Regional Counsel, and Richard Gordon Bartmon, Assistant Regional Counsel, Office of Criminal Conflict and Civil Regional Counsel, Fourth District, West Palm Beach, Florida,

      for Petitioner

Stephanie Christina Zimmerman, Deputy Director and Statewide Director of Appeals, Children's Legal Services, Bradenton, Florida; and Karla F. Perkins, Appellate Counsel, Children's Legal Services, Miami, Florida,

      for Respondent Florida Department of Children and Families

Dennis Wayne Moore, Thomasina Moore, and Wendie Michelle Cooper, Sanford, Florida,

      for Respondent Guardian ad Litem Program