# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2023-0129
_____

J.M., mother of K.M. and A.M.,
minor children,

     Appellant,

     v.

DEPARTMENT OF CHILDREN AND
FAMILIES,

     Appellee.

_____

On appeal from the Circuit Court for Columbia County.
Leandra G. Johnson, Judge.


November 27, 2023


TANENBAUM, J.


A mother appeals a final order terminating her rights to be a parent to her two children, K.M. and A.M. ("TPR"). She couches her appeal in terms of evidentiary sufficiency. The thrust of her argument for reversal, however, is that the trial court essentially engaged in what she characterizes as improper "victim shaming." She contends that the termination came as a direct consequence of her having contact with the abusive father in the presence of their children after being ordered by the trial court not to, but that she was not warned of this consequence. The trial court, however, did not consider the department's petition in a vacuum. In fact, it had available to it several years of experience with the two parents as

they tried to progress through a case plan. Despite her completion of the case plan and reunification with her children based on her apparent development of protective capacities, there was sufficient evidence before the trial court to support its determination that she continued to pose a danger to her children. It was for *that* reason the trial court terminated her parental rights. We reject her argument and affirm.[*]

To place the TPR in context, we must go back to 2019, when the underlying proceeding began upon the department's filing of a shelter petition. The premise of the petition was the children's repeated exposure to a swirling combination of domestic violence, mental health issues, and substance abuse while living with both their parents in a camper. It all came to a head one night when the children were present for a physical altercation between the parents—just the latest in a series of domestic violence incidents requiring police intervention. On that night after the police responded, the father threatened self-harm and was committed under the Baker Act.

The children's shelter and dependency adjudication rested on the readily apparent volatile relationship between the couple. The father struggled with substance abuse, previously had been committed under the Baker Act, and tended to have frequent,

---

[*] The mother also contends that termination under the circumstances was not the "least restrictive means of protecting the children from harm," under the circumstances. She misunderstands how that query works. *See P.B. v. Fla. Dep't of Child. & Fams.*, 335 So. 3d 804, 807–08 (Fla. 1st DCA 2022) (explaining that "'[l]east restrictive means' refers specifically to 'what actions were taken by the State *before* filing the petition to terminate the parent's rights,'" and "is a retrospective query that considers what DCF *already did* to salvage safely the parent-child relationship *prior to* its filing of the TPR petition" (quoting *S.M. v. Fla. Dep't of Child. & Fams.*, 202 So. 3d 769, 778 (Fla. 2016))). Because the department already had provided a case plan, which the mother completed, and reunification had been achieved once, we can find no due-process deficiency in this respect. *See Padgett v. Dep't of Health & Rehab. Servs.*, 577 So. 2d 565, 571 (Fla. 1991).

unpredictable, violent outbursts while the children were present. The mother, meanwhile, showed an inability to control him or protect the kids from that exposure. She also struggled with mental health issues of her own, herself having been committed under the Baker Act following an incident in the back of a police cruiser where she repeatedly beat her head on the partition until she drew blood. It seemed that the mother's mental health issues were exacerbated by the father's behavior.

To address these issues, the department provided both parents with a case plan, recommending reunification as the ultimate goal. Issues to be addressed for the mother included learning how to control her mental health, developing plans to provide for the children's safety, and keeping the home safe from abuse, neglect, and domestic violence. By October 2020, the mother had not reached substantial compliance with the case plan, and the department recommended that the case plan be changed to add adoption as a goal. Instead, the case plan was extended. Eight months later, in June 2021, the department filed its first TPR petition. Though a hearing date was set, DCF withdrew its petition prior to the hearing.

Things turned around for a bit after the father began addressing his substance abuse. Eventually, the family care counselor assigned to the case concluded that both parents had "enhanced their protective capacities." That improvement convinced the counselor that both parents had "changed their behavior" and should be reunified with the children. Both parents were reunified with the children in February 2022. In the initial weeks after reunification, the children and parents were adjusting well and there were no reportable issues. Subsequent visits, however, revealed that the father had relapsed into substance abuse. This use resulted in the counselor and the mother implementing further safety plans to protect the children. The father decided to move out of the camper to protect the kids from his continued drug use. His move did not last long, and he shortly moved back into the home. Verbal and physical altercations resumed between the parents.

Concerned for the safety of the children, the mother sought and obtained a domestic-violence injunction against the father.

3

The trial court, of course, was aware of the family history and specifically directed the mother *not to have contact with the father*—meaning she could not be the one supervising the children's visits with the father under the ongoing effort at reunification. Shortly thereafter, though, the mother was caught bringing the children to the father and being with him in the kids' presence. The mother later testified about this as follows:

> Q Okay. And do you recall that the judge specifically said no interaction between the two of you?
>
> A I do. I do.
>
> Q Don't contact him. He doesn't contact you. You recall all of that?
>
> A I do.
>
> * * *
>
> It wasn't, other than the fact that no matter what happens between us, he's always going to be their father. And I feel that if I could provide just a little bit of administrative, you know, the secretarial duties to help get him somewhere when he's finally, after 30 years, asking for help, my kids deserve that.

The department filed a second TPR petition, and after an evidentiary hearing, the trial court rendered the TPR order that is on review now. Contrary to the mother's characterization, the order was not to shame her or punish her for disobeying a direct order from the court. Instead, the trial court found that despite the mother having appeared to develop an ability to recognize the cycle of abuse, power, and control and to articulate a plan of action in response to future violent acts—sufficiently, in fact, to justify reunification—after obtaining the then-recent domestic violence injunction, she still "chose to place [the children] at risk of exposure to domestic violence." The trial court also noted that the mother then sought to keep it from finding out that she had had contact with the father in the presence of the kids. The trial court determined that the mother "continued [to exhibit] impulsive behaviors that are significantly likely to expose these children to

domestic violence." It concluded that the circumstances that prompted the shelter and dependency in the first place, as it turned out, had "not been remedied" after all, despite all the services provided.

There was testimony to support this determination. The counselor who had been working with the mother and originally recommended reunification, explained as follows:

> [The mother], you know, we had had the conversations that [the father] was going to make [her] choose either him or the children, that, you know, because of his behaviors, there was no way that they could continue together in a relationship and have the children together, because it was just a chaotic, unsafe environment when they were together.
>
> * * *
>
> On 6/21 is when [the mother] got the injunction, and I actually sat with [her] and the kids at the park all day that day while she was waiting on the injunction. And had the conversation with her that, you know, she made the decision and felt that it was significant enough to get and seek an injunction for safety against him, that there was no going back now; that she could not have contact with him and keep her children; that she had to choose to either protect herself and the children or help [the father]. And she understood at that point that she had to make the decision for her and her children to, to be away from [the father] until he figured out, himself, how to get help on his own, and clear himself up from the substances and the violence. And she told me that day that she was just tired of the kids hearing him call her derogatory terms, yelling, them cussing and yelling at each other. And I told her, I said, You're absolutely right, you know, the kids should not be subject-subjected to that. And now you've made this step and you know what the consequences are. You know, you guys cannot keep them safe together.

5

The counselor explained her recommendation for termination from there, as follows:

> So my recommendation on that was I felt that neither one of the parents was going to recognize how toxic their relationship was together and, and follow — I mean, because now we even have a blatant court order that says they are not to have contact and they're still having contact. So, you know, that they could make those decisions on their own to stay away from each other for the protection of the kids, I did not feel they would be able to do, because even a court order, you know, somebody else telling them you are not allowed to be together, they were still violating that, despite the injunction.

The trial court determined that there was clear and convincing evidence establishing both the statutory grounds for termination alleged in the petition, but we need only focus on one. *See* § 39.802(4)(a), Fla. Stat. ("A petition for termination of parental rights filed under this chapter must contain facts supporting the following allegations: That at least one of the grounds listed in s. 39.806 has been met."). The trial court determined that there was clear and convincing evidence to support termination pursuant to section 39.806(1)(c), Florida Statutes, which provides for termination when "the parent or parents engaged in conduct toward the child or toward other children that demonstrates that the continuing involvement of the parent or parents in the parent-child relationship threatens the life, safety, well-being, or physical, mental, or emotional health of the child irrespective of the provision of services." The trial court supported its conclusion by finding that the conditions that had led to the creation of the placement and case plan had not been rectified, and that due to the mother's continued behavior, any return to the home would be detrimental to the children. There was ample evidence to support this determination, and we are not here to second-guess the trial court's assessment of *all* the history and circumstances that led the mother to that point in the proceeding.

Before closing, we offer one remark on the mother's argument that she was not sufficiently warned of the consequences of her

6

disobeying the trial court's directive to avoid contact with the father in front of the children. Her argument treats the TPR as if it is a punishment for her conduct. That is not what these proceedings are about. The focus of chapter 39 (inclusive of both dependency and TPR proceedings) is not the best interests of the parent or the correction of a parent's bad behavior. From beginning to end, proceedings under chapter 39 are centered on the protection and welfare of the child, balanced against the right of a parent to be a parent to that child. *See* § 39.001(1), Fla. Stat. (enumerating the purposes of the chapter, all of which focus on the "care, safety, and protection of children" and to prevent abandonment, abuse, and neglect); *cf. Noeling v. State*, 87 So. 2d 593, 598 (Fla. 1956) ("We cannot overlook the fact that although the welfare of the juvenile is the guiding star that leads the Judge to his conclusion, nevertheless, the natural right of a parent is not to be lightly regarded."); *In re Camm*, 294 So. 2d 318, 320 (Fla. 1974) ("While Florida courts have recognized the 'God-given right' of parents to the care, custody and companionship of their children, it has been held repeatedly that the right is not absolute but is subject to the overriding principle that it is the ultimate welfare or best interest of the child which must prevail.").

The trial court's evidence-supported TPR findings were commensurate with this focus on the children's well-being, and they must be considered in the context of the historical mosaic for this family demonstrated by the entire record of this multi-year proceeding. We find no legal error in the trial court's TPR based, at a minimum, on the ground stated in section 39.806(1)(c). The mother does not challenge the trial court's findings supporting its conclusion that TPR is in the manifest best interests of the children, so we do not review the sufficiency of that determination. *See* §§ 39.802(4)(c), 39.810, Fla. Stat. As we stated in the margin at the beginning, least-restrictive means is not at issue either, because a case plan previously had been provided. The mother otherwise had notice and an opportunity to be heard, so she has been afforded the process constitutionally due her.

AFFIRMED.

BILBREY and NORDBY, JJ., concur.

7

---

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

---

Valarie Linnen, Jacksonville, for Appellant.

Carolyn Schwarz, Children's Legal Services, Fort Lauderdale, for Appellee Department Children and Families.

Sara Goldfarb and Lucy Wiggins Hoover, Tallahassee, for Appellee Guardian Ad Litem.