# Supreme Court of Florida

_____

No. SC2023-0604

_____

**STATEWIDE GUARDIAN AD LITEM OFFICE,**
Petitioner,

vs.

**C.C., et al.,**
Respondents.

_____

No. SC2023-0605

_____

**DEPARTMENT OF CHILDREN AND FAMILIES,**
Petitioner,

vs.

**C.C., et al.,**
Respondents.

March 7, 2024

FRANCIS, J.

The Department of Children and Families (the Department)

and the Statewide Guardian ad Litem Office (GAL) seek review of

the Fifth District Court of Appeal's decision in *C.C. v. Department of*

*Children & Families*, 47 Fla. L. Weekly D2323 (Fla. 5th DCA Nov. 14, 2022), which reversed the trial court's final order terminating the father's, C.C.'s, parental rights.[1]

Because the Fifth District's decision failed to properly apply our precedent in *S.M. v. Florida Department of Children & Families*, 202 So. 3d 769 (Fla. 2016), we quash the decision below and remand to the Sixth District to affirm the trial court's final order terminating C.C.'s parental rights to L.A.[2]

## I. BACKGROUND

L.A., the child at the center of these proceedings, is a six-year-old boy who was sheltered by the Department shortly after his birth in 2017,[3] due to his mother's continued physical abuse of his older

---

1. We have jurisdiction. *See* art. V, § 3(b)(3), Fla. Const.

2. This case was originally heard by the Fifth District; however, after the opinion was released, the Department and GAL each filed a motion for rehearing, rehearing en banc, and certification. While those motions were pending, the case was transferred to the newly formed Sixth District.

3. L.A. was removed from the mother's care due to her involvement with the Department. The mother's parental rights to L.A. were terminated, along with the father's; however, only the father's case is currently before this Court.

brother. He has lived with his current foster family for the past six years.

At the time L.A. was sheltered, C.C. was living in North Carolina and was facing charges of driving while impaired for which he would be convicted. It marked C.C.'s eighteenth conviction in a fifteen-year period.[4] He would go on to secure two other such charges. And even though he repeatedly completed inpatient drug and alcohol treatment as part of his criminal cases, he did not change his ways.[5] C.C.'s latest conviction landed him in prison for 25-39 months, with a release date of September 2023. Of the past six years (the course of the Department's involvement), C.C. has been incarcerated for three of those years.

One of C.C.'s more egregious crimes was first-degree arson and assault with a dangerous weapon arising from a domestic violence incident. Specifically, he stabbed his paramour and

---

4. C.C.'s convictions run the gamut: domestic violence, arson, driving while intoxicated (repeatedly), reckless driving to endanger (repeatedly), hit and run, felon in possession of a firearm, assault by pointing a weapon, and communicating threats.

5. Both the Department and C.C. allege that he no longer has substance abuse issues.

mother of one of his children, injuring her arm, neck, back, and hand; the injuries required stitches.  He then poured gasoline on the home and set it on fire, while his older son and another child were inside.[6]  For these crimes, C.C. spent seven years in prison.

Although L.A. has always lived in Florida, C.C. resided in North Carolina for the duration of the Department's involvement.  He did, however, have some minimal involvement in L.A.'s life.  For instance, he visited L.A. three or four times per year in person, and video-chatted with L.A. when he wasn't incarcerated.  However, C.C.'s remote video visits with L.A. became more difficult for L.A. when those visits resumed after C.C.'s release from incarceration in early 2020.  The longest C.C. spent in-person with L.A. at one time was for four hours, and he did this on two occasions: once in 2019 and once in 2020.  C.C. nevertheless provided some financial support for L.A., both at the holidays and upon the caregiver's request.

When the Department first became involved with the family six years ago, C.C. sought to obtain custody of L.A. in North Carolina,

6.  C.C. denied that his older son was present.

so an Interstate Compact on the Placement of Children home study was completed in that state. The home study report concluded, however—after listing his numerous convictions from 2002-2017—that it would be nearly impossible for C.C. to obtain a positive home study in North Carolina. As a result, C.C. prepared to move to Florida in order to obtain custody of L.A. Though he reported he had leased an apartment in Jacksonville, C.C. did not commit to moving and ultimately went back to North Carolina because he didn't like Florida's "atmosphere." He was arrested and incarcerated in North Carolina shortly thereafter for driving while impaired.

During the Department's initial involvement, it took numerous actions directed at rehabilitating C.C. and fostering a relationship between him and L.A. Beginning in March 2018—a year and a half before the first petition for termination was filed—the Department offered to provide C.C. a voluntary case plan and pay for all associated services. C.C. agreed to the voluntary case plan, and the trial court accepted it.[7] That case plan required C.C. to participate

_____

7. Although the trial court stated in its final order (and the Fifth District recited) that C.C. had no case plan tasks and/or no

in a psychological evaluation and follow recommendations, complete individual counseling, attend parent coaching, obtain stable employment and housing, and exercise supervised visitation with L.A. Despite C.C. living in North Carolina for the duration of the Department's involvement, the Department referred C.C. to various services and paid for all of the services he received.

Following his third conviction for driving while impaired, the Department changed course from offering a voluntary case plan with the goal of reunification, to petitioning for termination of C.C.'s parental rights based on: (1) abandonment; (2) continuing involvement threatening L.A.'s life, safety, well-being, or physical, mental, or emotional health; (3) chronic substance abuse; and (4) L.A.'s placement in out-of-home care for 12 of the last 22 months. § 39.806(1)(b), (c), (j), (e)3., Fla. Stat.[8]

---

case plan was offered to him, this finding is not supported by competent, substantial evidence. The record clearly shows that the Department offered C.C. a voluntary case plan with associated tasks, C.C. agreed to the case plan, the trial court accepted the case plan, and the Department paid for all services associated with C.C.'s case plan tasks.

8. The Department filed its first petition for termination in October 2019, and the matter went to a final hearing in February 2020; however, due to COVID restrictions, the final hearing was not

At a final hearing on the Department's petition in the spring of 2022, the trial court entered a final order terminating C.C.'s parental rights based on the Department having proven (1), (2), and (4) above. Regarding (1), the court reasoned that C.C.'s repeated incarceration, provision of token support, and failure to maintain a substantial and positive relationship with L.A. constituted abandonment. Regarding (2), the court determined that C.C.'s repeated incarceration and unavailability caused a risk of harm to L.A. despite C.C. receiving services on multiple occasions. And regarding (4), the court found that L.A.'s placement in out-of-home care met the 12-of-the-past-22-months benchmark because L.A. was sheltered in December 2017, and hadn't returned home by the time the final order was entered in April 2022.

completed until November 2020. At that time, the trial court denied the Department's petition. The Department and GAL sought rehearing, and the trial court sua sponte granted a new final hearing. Prior to the commencement of the second hearing, the Department filed the most recent amended petition alleging the grounds for termination set forth here.

The trial court also found that it was in L.A.'s manifest best interests to have C.C.'s rights terminated, and termination was the least restrictive means of protecting L.A. from serious harm.

On appeal to the Fifth District, C.C. argued one issue: that the trial court erred in finding that termination was the least restrictive means of protecting L.A. In response, the Department and GAL argued: (1) there was competent, substantial evidence supporting the trial court's least restrictive means determination; (2) section 39.806(2), Florida Statutes, relieved the Department of having to make reasonable efforts where the trial court found statutory grounds under section 39.806(1)(b) (abandonment) and (1)(c) (continuing involvement); and (3) termination was the least restrictive means pursuant to this Court's decision in *In Interest of T.M.*, 641 So. 2d 410 (Fla. 1994).

The Fifth District, however, agreed with C.C. and concluded: "Under the facts of this case, and in the absence of other reasonable efforts at reunification, a case plan should have been provided to [C.C.], with the opportunity to perform satisfactorily thereunder, before DCF pursued severance of his parental rights." *C.C.*, 47 Fla. L. Weekly at D2326.

The court then held there was not competent, substantial evidence that termination was the least restrictive means of protecting the child. *Id.* In reaching its determination, however, the Fifth District impermissibly reweighed the evidence and failed to properly apply our decision in *S.M.* Accordingly, we quash the Fifth District's decision.

## II. ANALYSIS

Before a trial court can terminate a parent's rights to his or her child, there are three elements the Department must prove.

First, the Department must prove by clear and convincing evidence that at least one statutory ground in section 39.806(1), Florida Statutes (2021), exists. *See* § 39.806(1), Fla. Stat. (2021); § 39.809(1), Fla. Stat. (2021) ("In a hearing on a petition for termination of parental rights, the court shall consider the elements required for termination. Each of these elements must be established by clear and convincing evidence before the petition is granted.").

Second, the Department must show that termination is in the child's manifest best interests. *See* § 39.810, Fla. Stat. (2021) ("In a

hearing on a petition for termination of parental rights, the court shall consider the manifest best interests of the child.").

And third, the Department must demonstrate that termination is the least restrictive means of protecting the child from serious harm. *See Padgett v. Dep't of Heath & Rehab. Servs.*, 577 So. 2d 565, 571 (Fla. 1991) ("[B]ecause parental rights constitute a fundamental liberty interest, the state must establish in each case that termination of those rights is the least restrictive means of protecting the child from serious harm.").

**S.*M.*'s Guiding Principles for the Least Restrictive Means Prong**

The least restrictive means element is a judicially implied requirement that "is tied directly to the due process rights that must be afforded to a parent before his or her parental rights are terminated." *S.M.*, 202 So. 3d at 778. We have addressed the least restrictive means prong numerous times since *Padgett*, and most recently, in *S.M.*

In *S.M.*, the Department became involved when the mother's youngest child tested positive for drugs at birth. *Id.* at 773. The mother was given a voluntary case plan, which required her to obtain stable housing, find a job, and participate in substance

abuse treatment. *Id.* After the mother failed to complete these tasks and was found living in unsafe housing, the Department sought to terminate her parental rights, and the trial court entered a final order to that effect. *Id.* at 774, 783-84. On appeal to the Fourth District Court of Appeal, the mother argued that termination was not the least restrictive means of protecting the children because they shared a loving bond, and a family member would allow the mother to regularly visit with the children. *Id.* at 774-75. The Fourth District disagreed and affirmed the trial court's order terminating the mother's rights.

In approving the Fourth District's decision, this Court discussed several guiding principles regarding the least restrictive means prong, including the following.

First, we acknowledged that the least restrictive means prong is tied to due process rights and focuses on what actions the State took to preserve the parent-child bond, prior to filing the petition for termination. *Id.* at 778. Second, we emphasized that the least restrictive means prong is centered on protecting the fundamental liberty interest in being a *parent* to a child, with all of the responsibility and care that parenthood entails. *Id.* And third, we

reiterated that the "the only limitation on this rule of parental privilege is that as between the parent and the child[,] the ultimate welfare of the child must be controlling." *Id.* (quoting *Padgett*, 577 So. 2d at 570).

### *S.M.*'s Application to this Case

Although the Fifth District's opinion in *C.C.* correctly began by discussing *S.M.* as to least restrictive means, the analysis went sideways when the court started reweighing the evidence on appeal. *See Herzog v. Herzog*, 346 So. 2d 56, 58 (Fla. 1977) ("Even if the appellate court disagrees with the trial court and would have reached a different conclusion had it been in the shoes of the trial court, barring a lack of substantial evidentiary support for the findings of the trial court, the judgment should be affirmed."). Instead, the Fifth District should have simply reviewed for competent, substantial evidence and applied *S.M.*, as discussed below. *See K.D. v. Dep't of Child. & Fams.*, 242 So. 3d 522, 523 (Fla. 1st DCA 2018) ("Our review, confined to the least restrictive means prong of the termination order, is highly deferential and limited to whether competent, substantial evidence supports the trial court's judgment and whether we cannot say that no one could

reasonably find such evidence to be clear and convincing. Our role is not to reweigh the evidence heard by the trial court." (internal quotation marks omitted)).

As to the first principle from *S.M.*—the actions the State took to preserve the parent-child bond—we consider the efforts the Department made from the time it became involved until filing the petition for termination. *See S.M.*, 202 So. 3d at 778. This due process protection does not require the Department to exhaust every possible service that could remotely help a parent; rather, the protection simply requires the Department to employ "fundamentally fair procedures" prior to seeking termination. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982). There is competent, substantial evidence supporting the conclusion that fundamentally fair procedures were employed here.

Although the Fifth District believed the Department should have provided more services to C.C. (including substance abuse treatment and services intended to reduce recidivism), it is clear the Department took numerous actions during the first year-and-a-half of its involvement that were directed at helping C.C. obtain custody

of L.A.—including offering C.C. a voluntary case plan with various tasks and paying for all associated services.

Even if C.C. could have benefited from additional services, the question remains whether there was a parent-child bond to re-establish.  *See S.M.*, 202 So. 3d at 778-79 ("The least restrictive means prong . . . simply requires that measures short of termination should be utilized if such measures can permit the safe *re-establishment* of the parent-child bond." (internal quotation marks omitted and emphasis added)).  As found by the trial court and contained in the record, the evidence is undisputed and shows there is no such bond:  L.A. was sheltered when he was days old and has never lived with C.C.; during the six years of L.A.'s young life, C.C. has never spent more than four hours at one time with L.A.; C.C. only saw L.A. in-person a handful of times per year when he was not incarcerated; and the GAL testified that C.C. and L.A. do not share a parent-child bond.

Second, as to the fundamental liberty interest at stake—the right to be a parent to the child—the parties do not dispute the minimal involvement C.C. had in L.A.'s life.  And the trial court correctly concluded that C.C.'s calls and visits when he wasn't

incarcerated, coupled with his sporadic financial support, do not demonstrate that he has the capacity to exercise his right to be a *parent* to L.A.

To this end, we find it significant that despite C.C.'s clear understanding that he would likely never pass a home study in North Carolina, he failed to move to Florida—the only state where he believed he could obtain custody of his son. By C.C.'s own testimony, he did not move to Florida because he "didn't like the atmosphere" here. Although it is certainly his prerogative to live where he wishes, C.C.'s decision to remain in North Carolina is competent, substantial evidence supporting the trial court's conclusion that termination is the least restrictive means. *See id.* at 780 ("If reunification is not possible because the father or mother cannot or will not assume responsibility as a parent to the child, . . . then termination is the least restrictive means of preventing harm." (quoting *S.M. v. Fla. Dep't of Child. & Fams.*, 190 So. 3d 125, 129 (Fla. 4th DCA 2015))).

Third, as to the principle that between the parent and the child the ultimate welfare of the child must be controlling, L.A.'s best interests must prevail over C.C.'s right to be a parent to him.

*See id.* As the trial court found, C.C.'s unwillingness to remain out of jail and prison, as well as the nature of his criminal convictions, present substantial threats to L.A.'s welfare. During C.C.'s months- and years-long absences, he did not have any contact with L.A. and clearly did not have the ability to have custody of L.A. at that time. Over the past six years—even while knowing that his parental rights were at stake—C.C. continued to engage in illegal activity that caused him to be unable to care for his son. Despite the Department's providing numerous services directed at helping C.C. obtain custody of L.A., he has not been able to overcome the issues that led to L.A.'s dependency; therefore, termination is the least restrictive means of protecting the child from serious harm. *See id.*

### III. CONCLUSION

We conclude that the Fifth District's decision improperly reweighed the evidence below and, thus, conflicts with our precedent. It is clear from our review that there is competent, substantial evidence in the record supporting the trial court's determination that termination is the least restrictive means of protecting L.A. from serious harm, while affording C.C. due process protections. We therefore disapprove and quash the Fifth District's

- 16 -

decision and remand to the Sixth District to affirm the trial court's order terminating C.C.'s parental rights to L.A.

It is so ordered.

MUÑIZ, C.J., and CANADY, LABARGA, COURIEL, and GROSSHANS, JJ., concur.
SASSO, J., recused.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

Application for Review of the Decision of the District Court of Appeal
    Direct Conflict of Decisions

    Sixth District - Case No. 6D2023-1357

    (Osceola County)

Dennis W. Moore, Executive Director, Sara Elizabeth Goldfarb, Statewide Director of Appeals, and Laura J. Lee, Assistant Director of Appeals, Statewide Guardian ad Litem Office, Tallahassee, Florida,

    for Petitioner Statewide Guardian ad Litem Office

Stephanie C. Zimmerman, Deputy Director and Statewide Director of Appeals, and Kelley Schaeffer, Appellate Counsel, Children's Legal Services, Bradenton, Florida,

    for Petitioner Department of Children and Families

Keith Peterson of the Law Offices of Peterson, P.A., Mulberry, Florida,

    for Respondent C.C.

- 17 -