SCHEB, JOHN M., Senior Judge.
The appellant, J.R., challenges the trial court’s judgment terminating his parental rights to his son, J.B. We conclude there was no clear and convincing evidence establishing any of the statutory grounds for termination of parental rights. Therefore, we reverse and remand for further proceedings.
J.R. is the father of J.B., who was born April 3, 2001. J.R. is also the father of two daughters who have now reached majority. On April 25, 2001, the Department of Children and Family Services (the Department) filed a dependency petition as to J.B. A petition was also filed as to J.R.’s daughters, who were ages fourteen and fifteen at the time. On June 29, 2001, J.R. consented to his three children being adjudicated dependent. The Department then developed a case plan with a target date of reunifying J.R. with his son and two daughters by June 30, 2002. A judicial review proceeding on September 17, 2001, revealed that J.R. was making significant progress on his case plan. As a result, J.R.’s teenage daughters were returned to his custody after only four months. The Department felt that reunification with the daughters was permissible because they were at a lower risk than the infant son, who remained in foster care. In October 2001, while on probation for a prior criminal offense, J.R. was arrested and charged with burglary for damaging his former employer’s restaurant during a fit of anger. He was sentenced to prison for five years. Consequently, he was unable to complete the case plan. The Department then placed J.R.’s teenage daughters in long-term relative placement with paternal relatives.
On March 19, 2003, the Department sought termination of J.R.’s parental rights to all three of his children. Later, it amended the petition to only seek termination of J.R.’s parental rights to J.B., and requested that J.B. be placed for adoption. The Department alleged the following statutory grounds for termination: (1) section 39.806(l)(b), Florida Statutes (2001), abandonment of the child; (2) section 39.806(l)(e), conduct toward the child demonstrating that the continuing involvement of the parent in the parent-child relationship threatened the life, safety, well-being, or physical, mental or emotional health of the child despite the provision of services; (3) section 39.806(l)(d)(3), the continuation of the parent-child relationship with the incarcerated parent would be harmful to the child; and (4) section 39.806(l)(e), failure to comply with the case plan. In July 2003, J.B.’s mother voluntarily surrendered her parental rights to J.B.
At trial in March 2004, Jenny Lanrra-cuente, a child protective investigator, testified that she became involved in the case in 2001 when an abuse report was filed involving J.B.’s mother. The report also alleged that J.R. had engaged in domestic violence in the home. Based on her inves *1204 tigation, J.B. was sheltered. In May 2001, an incident of domestic violence occurred at J.R.’s residence, which resulted in J.R.’s daughters being removed from the home. J.R. was given a case plan with a goal of reunification, in spite of his lengthy criminal history.
Caron Cole, J.B.’s case manager, stated that according to his case plan, J.R. was to have certain mental health evaluations and counseling, and he was required to take various self-improvement classes. He also had to maintain stable housing and employment, submit to random urinalyses, and follow all conditions of his probation. Ms. Cole testified that J.R. had compliéd with some of the tasks on his case plan, including the psychosocial evaluation, the substance abuse evaluation and random urinalysis. He was in partial compliance with the anger management classes and the AA meetings but he had not yet obtained a psychological evaluation, despite having received a referral. Ms. Cole stated that the Department pursued adoption for the minor child because J.R. did not have the ability to provide the child with his material needs and because the child had been in foster care for most of his life, almost three years, and had bonded with his foster family.
John Appell, the child’s guardian ad li-tem, testified that J.B. was doing very well in his current placement. He recommended against removing J.B. from his foster home when J.R. was released from prison because J.R. had not demonstrated the ability or disposition to provide his son with his material or medical needs and had not established a bond with the child. Mr. Appell recommended termination of J.R.’s parental rights and that J.B. be adopted by the foster parents. Mr. Appell acknowledged that he was not the first guardian ad litem on the case, that the prior guardian ad litem, Ms. Volk, had corresponded with J.R. and had commended him on his working hard at bettering himself at the correctional institution by taking anger management courses, parenting classes, by attending church and AA meetings, and enrolling in a computer course.
The Department also presented the testimony of two Pinellas County Sheriffs deputies, who offered evidence of J.R.’s criminal conduct before J.B. was born. In addition, the Department called Dr. Michael Greenberg, a licensed psychologist, who testified that J.R.’s criminal history was typically associated with an antisocial personality disorder. He found no basis to believe that J.R.’s behavior would change in the future, that further services would be futile, and that the child would be at risk of future harm if returned to his father. Dr. Greenberg admitted that he had not seen or personally spoken with J.R. or any of J.R.’s family members. Rather, he stated that he had not made a diagnosis of J.R.; that his testimony was based on a hypothetical question and his review of records.
Dr. Greenberg also opined that if removed from his present placement, the child might be expected to experience profound depression, anxiety, and fear. At school, the child may have behavioral problems, difficulty learning or regress in certain developmental tasks.
Vivian Morrow, the child’s foster mother, stated that she had had custody of the child since July 7, 2001, when he was three months old, and that she and her husband would like to adopt him. Ms. Morrow testified that since J.R. went to prison in October 2001, he had not offered financial support for J.B.’s care. Before he was arrested, however, J.R. would visit J.B. at least once a week, if not more frequently.
J.R. testified that he had separated from the child’s mother, obtained custody of his *1205 daughters, and sought custody of his infant son. When his daughters were removed from his custody, he was given a case plan. In accordance with his case plan, he attended substance abuse classes, followed all recommendations and submitted to random urinalyses, which all came back negative. He also completed anger management classes in late August or September of 2001 and completed the psychosocial evaluation task. J.R. claimed that he did not get the psychological evaluation required by his case plan because, despite his requests, the Department never set it up. He also claimed that he endeavored to get a psychological evaluation because his case worker told him that was the only thing keeping him from being united with his son.
J.R. stated that he had not used drugs since he was last released from prison and that he had been doing a good job of caring for his daughters. He attended AA meetings while in prison and continued attending church. The only part of his case plan that he did not comply with was the requirement that he have no new law violations. By committing a new offense, which he regretted, he violated the terms of his probation for which he was sent to prison. Prior to being incarcerated, he visited his son once a weekend. He has attempted to continue his relationship with his son while incarcerated by writing to him often. Finally, he stated that he wishes to work on a case plan with a goal of reunification as soon as he is released from prison in March 2006.
On April 8, 2004, the trial court entered a final judgment terminating J.R.’s parental rights to his son under sections 39.806(l)(b), 39.806(l)(c), 39.806(l)(d)(3) and 39.806(l)(e). The trial court found:
[T]his father abandoned this child by committing the burglary offense in October 2001 which he had to know could lead to a substantial period of incarceration, as per his own testimony at trial, and by his own admissions to his twenty-year criminal history. This father knew that incarceration was a foreseeable consequence of his criminal acts, and based on his criminal history, the chances of receiving an enhanced sentence were greater.
This father has been incarcerated since October 2001 and his expected release date is 2006. This father will be incarcerated for the first five (5) years of the child’s life, and has therefore abandoned this child during his formative years, for what is arguably the most significant portion of the child’s life.
This appeal by J.R. ensued.
At the outset, we observe that parents have a fundamental liberty interest in the care, custody, and management of their children. Santosky v. Kramer, 455 U.S. 745, 754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The fundamental liberty interest of natural parents “does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State.” Id. at 753, 102 S.Ct. 1388. To justify termination of parental rights, the State has the burden to show by clear and convincing evidence that reunification with the parent poses “a substantial risk of significant harm” to the child, such as abuse, neglect or abandonment. Padgett v. Dep’t of Health & Rehabilitative Servs., 577 So.2d 565, 571 (Fla.1991); W.W. v. Dep’t of Children & Families, 811 So.2d 791, 793 (Fla. 4th DCA 2002). The supreme court has defined “clear and convincing evidence” as an “intermediate level of proof [that] entails both a qualitative and quantitative standard. The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient *1206 weight to convince the trier of fact without hesitancy.” Dep’t of Children & Families v. F.L., 880 So.2d 602, 614 n. 7 (Fla.2004) (Cantero, J., concurring) (quoting In re Davey, 645 So.2d 398, 404 (Fla.1994)). Based on these standards we review the statutory grounds the trial court assigned for termination of J.R.’s parental rights.
Section 39.806(l)(b)
 Pursuant to section 39.806(l)(b), the trial court found that J.R. had abandoned his son as defined in section 39.01(1), which states: “The incarceration of a parent, legal custodian, or caregiver responsible for the child’s welfare may support a finding of abandonment.” Although a court may consider a parent’s criminal history and incarceration as factors when deciding whether to terminate parental rights on the grounds of abandonment, incarceration alone is insufficient grounds to terminate parental rights on the grounds of abandonment. W.T.J. v. E.W.R., 721 So.2d 723 (Fla.1998); J.T. v. Dep’t of Children & Family Servs. (In re T.B.), 819 So.2d 270, 272 (Fla. 2d DCA 2002).
The record shows that before J.R. was incarcerated, he actively sought custody of his son. He bought supplies for the child’s care and visited him on a weekly basis. Since he has been in prison, he has attempted to maintain contact with the child, even though the child’s young age makes it difficult for him to establish any kind of bond with him. Considering J.R.’s demonstrated interest in his son and his near completion of his term of incarceration, the Department did not provide clear and convincing evidence that J.R. had abandoned his young son under this section.
Section 39.806(l)(c)
In support of its finding under section 39.806(l)(c) that J.R. engaged in conduct toward his child that .threatens the parent-child relationship, the trial court placed considerable reliance on the testimony of Dr. Greenberg, the psychologist who found J.R.’s criminal history to be typically associated with an antisocial personality disorder. Dr. Greenberg found no basis to believe that J.R.’s behavior will change in the future, that further services would be futile, and that the child would be at risk of future harm if returned to J.R. As noted, Dr. Greenberg admitted that he had no contact with J.R. or any other family member and based his testimony entirely on records he reviewed.
The Department also presented evidence of J.R.’s criminal conduct largely occurring in the 1980’s and 1990’s, with some more recent instances of misconduct. Presumably, the Department was aware of J.R.’s criminal history when it offered him the case plan and when it agreed, after his arrest, not to seek termination of his parental rights to his daughters.
The Department’s case worker testified that the foster home where the child was living was a prospective adoptive home and that the Department was pursuing adoption for the child. It was the Department’s position, she explained, that at the present time J.R. did not have the ability to provide his child with material needs and it was in the best interest of the child to terminate J.R.’s parental rights. However, it was only due to J.R.’s incarceration that he was unable to provide for J.B.’s material needs, and, as we have noted above, incarceration alone is not grounds for termination of parental rights. See C.B. v. Dep’t of Children & Families, 874 So.2d 1246 (Fla. 4th DCA 2004).
The guardian ad litem recommended that the child remain in his current foster home to be adopted by the foster parents because the placement was “ideal.” The guardian noted that J.B. had bonded with his foster parents and siblings and that his material and medical needs were being *1207 met. However, he acknowledged that the prior guardian ad litem had corresponded with J.R. and commended him on his working hard to better himself at the correctional institution.
While a parent’s past conduct necessarily has some predicative value as to that parent’s likely future conduct, positive life changes can overcome a negative history for purposes of termination of a parental rights analysis. W.R. v. Dep’t of Children & Family Servs., 896 So.2d 911 (Fla. 4th DCA 2005). Here, J.R. stated that he had discontinued his substance abuse, which was evidence by his negative urinalysis tests, that he had ceased resorting to criminal activity to earn a living or to supply his drug habit, that he was taking whatever self-improvement courses he could in prison, and that he was determined to provide for his child’s needs. He stated that he committed his most recent burglary by throwing a rock at his former employer’s business and breaking a window out of frustration, and that he regretted doing so. It is error to terminate under section 39.806(l)(c) “when improvement was demonstrated and further improvement was possible.” K.S. v. Dep’t of Children & Family Servs. (In re N.S.), 898 So.2d 1194, 1198 (Fla. 2d DCA 2005); M.H. v. Dep’t of Children & Families, 866 So.2d 220 (Fla. 1st DCA 2004) (holding that in order to terminate under section 39.806(l)(e), the State must show that the child’s welfare would continue to be threatened by the parent regardless of the provision of services and that there is no reasonable basis to believe that the parent will improve).
The Department failed to carry its burden to show that J.R. engaged in conduct toward his child which threatened his well-being under section 39.806(l)(c).
Section 39.806(l)(d)(3)
The trial court found that pursuant to section 39.806(l)(d)(3) continuing the parental relationship with the incarcerated parent would be harmful and that termination of the parental relationship would'be in the best interest of the child. Of course, the “best interests” test becomes important once a statutory ground for termination is established. See J.J. v. Dep’t of Children & Families, 886 So.2d 1046 (Fla. 4th DCA 2004). And, where, as here, there is no evidence that J.R.’s incarceration would adversely impact the child, a trial court is precluded from terminating a father’s parental rights on the statutory ground that continuing the parental relationship with the incarcerated parent would be harmful to the child. See J.P.C. v. Dep’t of Children & Family Servs. (In re J.D.C.), 819 So.2d 264 (Fla. 2d DCA 2002). This case is unlike R.M. v. Department of Children & Families, 847 So.2d 1103 (Fla. 4th DCA 2003), in which the children’s therapists testified as to the children’s mental state, their present lack of a relationship with their incarcerated father, and the detrimental effect that being reunited with the father would have on them. See N.S., 898 So.2d at 1198 (holding that a trial court is precluded from terminating parental rights under section 39.806(l)(d)(3) where no evidence regarding the impact of continuing the parent-child relationship is offered).[1]
Based on the record before us, the Department failed to prove that termination was required under this section.
Section 39.806(l)(e)
Under section 39.806(l)(e), a petition for termination of parental rights may be filed when a child has been adjudicated dependent, a case plan has been filed with *1208 the court, and the child continues to be abused, neglected, or abandoned by the parents. The failure of the parent to substantially comply with the case plan may constitute evidence of abuse, neglect or abandonment. The trial court found that this section applied in this case because J.R. failed to substantially comply with his case plan.
However, the record shows that J.R. was in substantial compliance with his case plan until his arrest and incarceration; the only question having been a conflict as to his scheduling a psychological examination. The Department changed the goal from reunification to termination because of J.R.’s arrest and incarceration, a scenario that bears some resemblance to A.D. v. Department of Health & Rehabilitative Services (In re S.D.), 670 So.2d 1099 (Fla. 2d DCA 1996). There, the father was in substantial compliance with his case plan and the Department was moving towards reunification. After the Department learned that the father had been in two physical confrontations, the Department changed its goal from reunification to termination. The trial court terminated the father’s parental rights, finding that the father had materially breached the provisions of his case plan. In reversing, this court held that the Department failed to meet its burden to establish the father failed to comply with the case plan.
In the ease before us, the Department established that J.R. had a serious record of criminal conduct that occurred before it offered him a case plan for reunification with his son. The Department did not offer any evidence that J.R. had abused, neglected, or abandoned his son; rather, evidence disclosed that J.R. took an interest in his son’s welfare before he was incarcerated, seeing his son at least once a week, if not more, prior to being arrested. Even after being incarcerated, J.R. has maintained regular written communication with his child and has attempted to reform his life before and during his imprisonment. At the present time, J.R. has been unable to comply with the remainder of his case plan or to provide for the child’s material needs. However, this is not due to lack of interest or neglect, but because of his incarceration, and therefore, this ground does not support termination. See Hutson v. State (In re E.L.H.), 687 So.2d 924 (Fla. 2d DCA 1997) (holding that the trial court improperly based termination of the father’s parental rights on the father’s failure to comply with his case plan since the father did not have the ability, due to his incarceration, to comply).

Conclusion

We conclude that the statutory grounds upon which the trial court based its judgment for termination are not supported by clear and convincing evidence. Therefore, we find it unnecessary to discuss the trial court’s reasons under sections 39.810(1)-(11), Florida Statutes (2001), that termination of parental rights was in the manifest best interests of the child.
Reversed and remanded to the trial court for further proceedings.
DAVIS and CANADY, JJ., Concur.

. We note that section 39.806(l)(d)(l) provides for termination if a parent is to be incarcerated for a substantial portion of the period of time before the child will attain age eighteen. The trial court, however, indicated it was not basing its ruling on this section.