DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**Q.L.,** the mother,
Appellant,

v.

**DEPARTMENT OF CHILDREN AND FAMILIES** and
**GUARDIAN AD LITEM PROGRAM,**
Appellees.

No. 4D19-526

[September 18, 2019]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Alberto Ribas, Jr., Judge; L.T. Case No. 12-3451CJ-DP (A, B, C).

Lori D. Shelby, Fort Lauderdale, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Carolyn Schwarz, Assistant Attorney General, Children's Legal Services, Fort Lauderdale, for appellee, Department of Children and Families.

Thomasina F. Moore, Statewide Director of Appeals, and Laura J. Lee, Senior Attorney, Appellate Division, Florida Statewide Guardian Ad Litem Office, Tallahassee, and Nicholas A. Brown, Carlton Fields, P.A., Defending Best Interests Project, Tampa, for appellee, Guardian Ad Litem Program.

GROSS, J.

A mother who never harmed her children (or any other child) had her parental rights terminated based on past conduct which, in the opinions of her caseworker and the guardian ad litem, would likely cause harm to her children in the future. Because the Department failed to prove statutory grounds for termination of the mother's parental rights by competent, substantial evidence, we reverse.

The trial consisted of five days of testimony, beginning in August 2017 and concluding in May 2018. Nine months later, the court issued its final

judgment terminating the parental rights of the mother and the father.[1] The court terminated the mother's parental rights on two statutory grounds: section 39.806(1)(c) (parent's past conduct demonstrates continuing involvement in parent-child relationship threatens to harm the child irrespective of services); and section 39.806(1)(e)3. (child has been in care 12 of past 22 months and parent is not in substantial compliance with case plan). The following facts were found by the trial court:

May 2012 – the children were sheltered when the mother was arrested.

June 2012 – the mother was offered a case plan with a reunification goal. Her initial case plan tasks were: individual counseling with a focus on decision making, random drug screens, substance abuse evaluation, "psychological with an ability to parent," obtain and maintain stable housing and income, and pay child support.

February 2013 – the father choked the mother to the point that she lost consciousness.

November 2013 – the mother had her restraining order against the father lifted.

2014 – the mother's case plan was amended to add domestic violence for victims and couples counseling.

Early 2015 – the children were reunited with the parents.

June 2015 – the parents fell three months behind on their rent.

July 2015 – the parents borrowed rent money from their pastor on the condition that they prepare a budget to avoid being in the same position in the future.

August 2015 – the GAL visited the apartment unannounced because the parents were not returning her calls to coordinate a home visit. She found that a person who was not background screened was watching the children. The apartment was in deplorable condition including bugs, maggots, garbage, and dirty dishes in the kitchen sink and on the floor. When the mother returned to the apartment, she screamed and cursed at the GAL. She was "unable to control herself and went

---

[1] The father's rights were terminated by default when he failed to appear for trial in May 2017. He has not appealed.

on a verbal rampage directed at the GAL in the presence of the children."

September 2015 – the parents once again fell behind on their rent and were ultimately evicted a few months later.

November 2015 – the mother had an angry outburst in court and kicked a door in the courtroom.  As a result, her case plan was amended to add individual counseling with an anger management component.

December 2015 – on the GAL's motion, the mother's case plan was amended to add a life coach.

December 2015 – the mother ended her eleven-year relationship with the father.

January 1, 2016 – the apartment was in deplorable condition again – roaches, dirty dishes, little food, a dog on the porch, and clothes on the bathroom floor next to the bathtub.

February 2016 – another domestic violence incident.  When the mother went to the paternal grandmother's home to drop off the children's laundry, the father was there and he attacked her because he did not believe she was wearing underwear.  The mother called the police, the child advocate, the GAL, and obtained a restraining order.

The children were taken into custody.

July 2016 – the Department petitioned for termination of the parents' rights to their three children, ages 6, 5, and 2.

November 2016 – the maternal great grandmother stated that she was no longer willing to keep the children due to problems with the mother and father.  The mother had another angry outburst in court.

January 2017 – another domestic violence incident.  The father stole the mother's money and phone and tried to steal her car.  The mother jumped in the back of the car to stop him.  The father eventually exited the car.  The mother called the police, the GAL, and the child advocate, and sought a restraining order.[2]

---

[2] The mother testified that she was sitting in her car outside of a friend's home when the father pulled her out of the car and attacked her.  She screamed for help and someone called the police.

<u>June 2017</u> – the mother was arrested for driving with a suspended license and resisting without violence. The officer testified that the mother refused to get back into her car, that she cursed at the officer, and that she was very belligerent.

<u>November 2017</u> – The mother was cited for speeding and once again, driving with a suspended license.

The court noted that the mother had completed <u>all</u> of the court-ordered tasks and was successfully discharged from all of her services; she had voluntarily completed additional tasks (batterers intervention and parenting for special needs children); and she had broken off her relationship with the father. However, the issue, as framed by the court, was "whether or not the mother had gained insight" from the services provided.

The court concluded, based on the totality of the circumstances, that the mother was not in substantial compliance with her case plan and that her continuing involvement in the parent-child relationship threatened the life, safety, well-being, or physical, mental, or emotional health of the children irrespective of services.[3]

The court noted that the first removal of the children resulted from the mother being arrested and that the mother "still exhibits poor decision-making skills and impulse control/anger management issues that can put the physical and emotional well-being of the children at risk." Citing many of the incidents recounted above, the court found that the mother exhibited poor judgment "consistent with . . . a lack of insight with regards to the services [she] had previously completed."

The court found an ongoing domestic violence threat because the last two incidents occurred after the mother broke off the relationship with the father. The court also found that the mother was not able to provide a safe and stable home for the children based on the incidents that occurred during reunification (parents fell behind on the rent, were bailed out and made a budget, but then fell behind again and were evicted; parents left the children with a person who had not been background-screened; the parents allowed the apartment to be in a deplorable condition on two occasions to such a degree that it caused a hazard to the children; and the

---

[3] The court also found that the mother's failure to substantially comply with her case plan was not the result of a lack of financial resources or due to a failure by the Department to make reasonable efforts to reunify the children.

mother went on a verbal rampage against the GAL in front of the children).

The court summarized its reasoning as follows:

> The mother continues to exhibit poor judgment and anger management issues, which would place the children at risk if they were in her care. The mother continues to exhibit behaviors, even after the break-up of the relationship with the father, which would place the children at risk due to domestic violence issues. The mother was unable to maintain stable housing after the initial reunification. The mother was unable to maintain the home hazard free after the initial reunification. Rather, the home was found to be in deplorable conditions on more than one occasion. There were maggots, dirty dishes, garbage, roaches, a foul odor, and caked on food seen in the home. These are not conditions that children should live in.

<u>Findings Lacking Evidentiary Support</u>

Before reaching the merits, we note that two of the court's conclusions lack evidentiary support. The court's finding of an *ongoing* domestic violence threat involving the father is not supported by the record. The testimony established that the mother broke up with the father in December 2015 and that there were two domestic violence incidents in the thirteen months after the breakup. It is undisputed that the mother got a restraining order after the first incident and petitioned for another restraining order after the second incident. The last incident of domestic violence was in January 2017. There was no evidence of domestic violence in the twenty-six months preceding issuance of the final judgment. In addition, the mother had not lived with the father for the three years preceding the final judgment and had a restraining order preventing him from being near her for most of that time. On similar facts, in *L.B. v. Dep't of Children & Families*, 835 So. 2d 1189, 1194 (Fla. 1st DCA 2002), the First District found the record "devoid" of evidence supporting a finding of "ongoing" domestic violence where the mother moved from the family home to avoid domestic violence incidents and the father was seeking a divorce.

We also find that the court's findings that the parents were not able to maintain stable housing and were unable to provide the children with a clean and hazard-free home were based on stale evidence rendered obsolete by subsequent events. The court's findings on this issue were based on conditions that existed three years before it issued the final judgment. The last time any of the Appellees' witnesses visited the mother's residence was in January 2016. When the mother testified, she

had moved twice since then. She no longer lived with the father, and the unrefuted evidence was that she had a lease, a steady job, and an appropriate home for the children. We find the evidence underlying the court's findings about her ability to maintain stable housing and provide the children with a clean and hazard-free home was not competent because it was stale. *See generally I.T. v. Dep't of Children & Families*, 44 Fla. L. Weekly D1650, D1651, n.7 (Fla. 3d DCA June 26, 2019) ("As the mother had both housing and employment from June 2018 to the date of the termination of parental rights hearing, at the time the trial court approved the case plan designating the goal of adoption, the grounds alleged in support of termination were stale.").

Termination of Parental Rights Under<br>Florida Statutes Section 39.806(1)(c)

Section 39.806(1)(c) provides that grounds for termination of parental rights may be established:

> When the parent or parents engaged in conduct toward the child or toward other children that demonstrates that the continuing involvement of the parent or parents in the parent-child relationship threatens the life, safety, well-being, or physical, mental, or emotional health of the child irrespective of the provision of services . . . .

§ 39.806(1)(c), Fla. Stat. (2016). Termination under this section is termination based on *prospective* abuse or neglect. Essentially, the trial court is asked to look at the parent's *current medical condition or past behavior* and predict whether the parent will likely harm the child in the future. "The issue in these types of cases is whether future behavior, which will adversely affect the child, can be clearly and certainly predicted . . . . Or, stated another way, whether it is likely to happen or expected." *J.F. v. Dep't of Children & Families*, 890 So. 2d 434, 440 (Fla. 4th DCA 2004) (citations omitted); *see also In re G.C.*, 6 So. 3d 643, 651 (Fla. 2d DCA 2009) (the Department must demonstrate "a nexus or predictive relationship between the past domestic violence or the Mother's mental health issues and future harm to the children.").

Generally, termination of parental rights under this subpart "requires proof that the parent suffers from a condition that makes probable the prospect of future abuse or neglect of a child and that the condition was one which was likely to continue." *R.K. v. Dep't of Children & Families*, 898 So. 2d 998, 1000 (Fla. 5th DCA 2005); *see, e.g., D.B. v. Dep't of Children & Families*, 87 So. 3d 1279 (Fla. 4th DCA 2012) (father with

schizoaffective disorder); *S.J. v. Dep't of Children & Family Services*, 866 So. 2d 770 (Fla. 4th DCA 2004) (mother addicted to drugs); *In the Interest of J.L.P.*, 416 So. 2d 1250 (Fla. 4th DCA 1982) (mother had limited mental capacity).

In this case, because there was no evidence that the mother suffered from any "condition," the Department was required to prove that future harm to the children was likely based on her past conduct. Termination of parental rights for "past conduct" is often seen in cases involving domestic violence. *E.g., T.O. v. Dep't of Children & Families*, 21 So. 3d 173, 179 (Fla. 4th DCA 2009) (father's parental rights were terminated based on his past domestic violence against the mother). General neglect is also "past conduct" that foretells likely future harm to a child. *E.g., J.P. v. Dep't of Children & Families*, 183 So. 3d 1198 (Fla. 1st DCA 2016) (medical neglect of child with special needs).

To terminate the mother's rights under this section, the Department was required to prove that the children's "life, safety, or health would be threatened by continued interaction with the parent, regardless of the provision of services" and that "there is no reasonable basis to believe the parent will improve." *T.O.*, 21 So. 3d at 179. We agree with the mother that the Department did not prove these two evidentiary requirements.

*(1) The Department Failed To Establish That The Mother's Past Conduct Makes Future Harm To The Children Likely to Happen.*

To establish the first evidentiary requirement, "the evidence must show a parent's past conduct or current mental condition makes the risk of future harm to the child likely." *D.B.*, 87 So. 3d at 1282. The Department was required to show that future harm to the children could be "clearly and certainly predicted," is "likely to happen," or is "expected" based on the mother's past conduct. *J.F.*, 890 So. 2d at 440.

For instance, expected future harm was found in a domestic violence case where the mother continued to live with the father; mere awareness by children of domestic violence is harmful; and the father's antisocial personality disorder and other character traits made future domestic violence in the home likely. *T.O.*, 21 So. 3d at 173. Again, expected future harm was found in *Palmer v. Department of Health and Rehabilitative Services*, 547 So. 2d 981, 984 (Fla. 5th DCA 1989), where the father was an untreated pedophile; experts testified that untreated pedophilia almost certainly results in recidivism; and placing a child in the home is "tantamount to placing matches in a tinderbox."

Here, the trial court's conclusion that the mother's "poor decision-making skills and impulse control/anger management issues . . . [could] put the physical and emotional well-being of the children at risk" was pure speculation. The only testimony about a possible risk to the children came from the caseworker. Relying on the mother's arrest for resisting in June 2017 and her continuing to drive on a suspended license resulting in a traffic citation in November 2017, the caseworker speculated that in the future, *if* the mother drove on a suspended license or resisted a police officer's command again, and *if* the children were with her at the time, and *if* the officer arrested her, then the children *might* be subjected to being removed or placed with a relative, *and then* they would be emotionally harmed because they would be sad. Termination of parental rights under this subpart mandates that expected future harm be *clearly and certainly* predicted. Expected future harm cannot be clearly and certainly predicted if the harm is incurred only by following a narrowly-defined path through a cascade of maybes. Expected future harm must be *likely*.

Here, while future harm to the children is possible, it cannot be clearly and certainly predicted based on the mother's occasional impulsive conduct and past instances where she made poor decisions. We find the caseworker was speculating, as was the trial judge, and parental rights cannot be terminated based on such speculation. *S.S. v. D.L.*, 944 So. 2d 553, 559 (Fla. 4th DCA 2007) ("non-expert speculation is not a sufficient basis for terminating parent rights."). Because the Department failed to establish the first evidentiary requirement, termination of the mother's parental rights under subpart 39.806(1)(c) was error.

*(2) The Department Failed To Establish That There Was No Reasonable Basis To Conclude That Past Behaviors Will Improve.*

We also find that the Department failed to establish the second evidentiary requirement—that that there was "no reasonable basis to conclude that past behaviors will improve." *D.B.*, 87 So. 3d at 1282. Typically, this second evidentiary requirement is established through expert testimony. Where there is no expert testimony on this issue, or where the expert testimony is based on observations, interviews, or reports that are obsolete, reversal may be appropriate because the trial court's findings would be speculative. *See I.T.*, 44 Fla. L. Weekly at D1652 (where the expert relied on a two-year-old evaluation, the court was "divested of a meaningful opportunity to appropriately assess the mother's amenability to treatment"); *S.S.*, 944 So. 2d at 559 (reversing termination of parental rights where the only testimony on the father's prognosis came from the GAL. Holding non-expert speculation is not a sufficient basis for terminating parent rights); *J.F.*, 890 So. 2d at 439-40 (the Department

failed to establish that long-term therapy would not have helped the mother's anger management problems where "the only professional tests conducted revealed that the mother was amenable to treatment").

Here, the Appellees did not call any experts, and there was no testimony that the mother would not or could not improve her behavior. On the contrary, the evidence established that in the years preceding the termination, the mother made drastic life changes that improved her situation dramatically. She broke up with the father, got restraining orders against him, and assisted the State Attorney in prosecuting him for the domestic violence. Since leaving the father and getting back on her feet, she has maintained steady employment and housing. In addition, the mother was receptive to the services offered and has asked for and completed additional services. It is unrefuted that the mother not only participated in her services, she was discharged successfully by each provider. Her batterers intervention therapist testified that she was open and very active in group and was helpful toward others.

When improvement is demonstrated and further improvement is possible, it is error to terminate parental rights under subpart 39.806(1)(c). *In re J.B.*, 923 So. 2d 1201, 1207 (Fla. 2d DCA 2006); *see also M.H. v. Dep't of Children & Families*, 866 So. 2d 220, 223 (Fla. 1st DCA 2004) (mother's efforts and "strong desire to overcome her addiction and parent her children . . . demonstrates a reasonable basis to believe [the mother's] problems could be improved"); *In re G.C.A.*, 863 So. 2d 476, 480 (Fla. 2d DCA 2004) ("Both parents' substantial compliance with numerous case plan tasks and obvious improvement contradict any conclusion that there is no reasonable basis to believe the parents will improve.").

Here, improvement was demonstrated, and the mother's progress established a reasonable basis to find that further improvement was possible. As such, it was error to terminate her parental rights under subpart 39.806(1)(c).

Termination of Parental Rights Under<br>Florida Statutes Section 39.806(1)(e)3.

Section 39.806(1)(e)3. provides that grounds for termination may be established when the child has been adjudicated dependent, a case plan has been filed with the court, and the child "has been in care for any 12 of the last 22 months and the parents have not substantially complied with the case plan . . . ." § 39.806(1)(e)3., Fla. Stat. (2016). "Substantial compliance" is term of art defined by statute, meaning the "circumstances which caused the creation of the case plan have been significantly

remedied to the extent that the well-being and safety of the child will not be endangered upon the child's remaining with or being returned to the child's parent." § 39.01(77), Fla. Stat. (2016). The "circumstances which caused the creation of the case plan" include problems identified subsequent to the initial removal. *C.B. v. Dep't of Children & Families*, 257 So. 3d 1078, 1081 (Fla. 4th DCA 2018).

The trial court found that the mother completed all of the tasks set forth in her case plan and was successfully discharged from all services provided. Nonetheless, the court concluded the mother failed to "substantially comply" with her case plan because the "mere completion of services is not equivalent to substantial compliance with a case plan," and according to the trial court, the issue was "whether or not the mother gained insight from such classes." We find the trial court applied an incorrect legal standard.

The issue is not whether the mother "gained insight" from her services. A parent's rights cannot be terminated solely on the imprecise notion that a parent failed to "gain insight" from services received. *L.A.G. v. Dep't of Children & Family Services*, 963 So. 2d 725, 729 (Fla. 3d DCA 2007) (Shepherd, J., concurring) ("I am unaware of any authority supporting termination on the basis of a "lack of insight" without more.").

The correct legal standard is whether the mother substantially complied with her case plan such that the circumstances which caused the creation of the case plan have been significantly remedied.

For example, in *A.B.E. v. Dep't of Children & Families*, 47 So. 3d 347 (Fla. 4th DCA 2010), the child was sheltered for physical abuse, and the case plan included a task requiring the mother to complete parenting classes. While the mother completed the classes, the instructor refused to provide a certificate of completion because the mother did not understand parenting and could not apply the skills and information she had been taught. Therefore, in *A.B.E.*, the circumstances which caused the creation of the case plan were not significantly remedied, and termination of the mother's parental rights for failure to substantially comply with the case plan was appropriate. *Id.* at 351-52. Another example of application of the correct legal standard for termination is provided by *A.W. ex rel. B.W. v. Department of Children & Families*, 969 So. 2d 496 (Fla. 1st DCA 2007). There, where the mother "technically performed all the superficial tasks set out in the case plan," the court affirmed termination of her parental rights because expert testimony established that due to her mild mental retardation she was "unable to learn the basic parenting skills necessary to rear her child." *Id.* at 503.

The trial courts in *A.B.E.* and *A.W.* relied on expert testimony proffered by the Department to determine the critical question of whether the circumstances which caused the creation of the case plan had been significantly remedied. Here, as noted above, the Department did not proffer any expert testimony.

The caseworker testified that the mother's counselors would all say that she had successfully completed her services. The Department's batterers intervention counselor (called by the mother) testified that successful completion of services meant attending sessions and gaining insight or benefitting. It follows that the Department's professional instructors and counselors were of the opinion that the mother gained insight into her services, otherwise they could not have successfully discharged her.

Yet the caseworker, with three years of experience at ChildNet, second-guessed the experts. The caseworker's testimony is not based on actual knowledge of the services provided to the mother or the lessons imparted by each professional. She did not attend the services with the mother, nor was there any testimony that she talked with the mother's providers. Instead, the caseworker testified generally about services the Department offers and what the lessons were supposed to address.

Because the caseworker had no actual knowledge of what was taught when the mother received her services, the caseworker's testimony that the mother failed to gain insight from the services was pure speculation. Speculation is not competent, substantial evidence upon which a court may find that the Department has established grounds for termination of parental rights. *L.A.G.*, 963 So. 2d at 729.

Finally, we note that the final judgment contains the finding that the mother had "not remedied the reasons why the case came into care." Again, this is an incorrect legal standard. The correct standard is whether the circumstances which caused the creation of the case plan have been *significantly* remedied to the extent that the well-being and safety of the child will not be endangered upon the child's being returned to the parent. § 39.01(77), Fla. Stat. (2016).

The initial case plan was created in 2012 when the mother reported to a probation office with her children in tow and tested positive for marijuana. She was arrested and the probation officer reported that: when she brought the children to her appointments they were dirty; he had visited the home on May 5, 2012, and it was "filthy, cluttered, and hazardous for the minor children"; and one of the children was once found

unattended in the apartment complex and could have fallen into a nearby lake. There were several problems identified subsequent to the children's removal resulting in added tasks. In 2014 the case plan was amended twice – first to address the mother's history of being in relationships where she was the victim of domestic violence and then to add couples counseling based on the parents' relationship. In 2015 the court added an anger management task based on the mother's conduct with the GAL and her outburst in court. In December 2015, on the GAL's motion, the court ordered a life coach based on the parents' inability to pay the bills and keep the home clean.

To the extent the case came into care for substance abuse, there was no evidence that the mother continued to use marijuana or any other substance. To the extent the case came into care because the mother neglected the children by not bathing them, the uncontroverted evidence was that the children always appeared clean. To the extent a child was endangered by being left alone in the apartment complex near an unguarded body of water, the mother no longer lives in that apartment complex. To the extent the case came into care because the mother allowed herself to be a victim of domestic violence, the mother broke off the relationship with the father, secured restraining orders against him, and assisted the State Attorney in prosecuting him.

The dirty house issue raised in the shelter petition was initially resolved, and the children were reunited with the parents. The issue reemerged during reunification at a time when the father lived with the mother, eviction proceedings were pending, and the parents were ending their eleven-year relationship. We find it significant that the caseworker never observed the apartment to be in deplorable or unsafe condition, despite her monthly visits. We also find it significant that, while the GAL personally observed the deplorable condition of the apartment, there was no resultant attempt to remove the children. The inaction of the parties indicates that, while there was a dirty house issue, it did not endanger the children. In this case, on these facts, the condition of the apartment on two occasions more than three years ago was not competent substantial evidence of the mother's failure to substantially comply with her case plan.

Finally, the court added an anger management task after the mother yelled at the GAL and had an outburst in the courtroom. Again, we find it significant that the mother's inappropriate display of temper occurred during reunification, and there was no resultant attempt to remove the children. Courtrooms can be frustrating places to litigants and there is no suggestion that the outburst endangered any child. Thus, while individual counseling with an anger management component was an

important service, beneficial to the family, it was not one of the reasons why the case came into care. We recognize the mother had a second outburst in court after completing her counseling, however, we do not believe this display of temper constituted competent substantial evidence that she failed to substantially comply with her case plan.

Because the Department failed to prove statutory grounds for termination of the mother's parental rights, we reverse and remand for the trial court to "fashion an order that complies with section 39.811, Florida Statutes." *J.J. v. Dep't of Children & Families*, 886 So. 2d 1046, 1049 (Fla. 4th DCA 2004).

NUTT, JAMES, Associate Judge, concurs.
MAY, J., dissents with opinion.

MAY, J., dissenting.

I respectfully dissent. Florida has a goal for permanent placement of children as soon as possible and that "no child remains in foster care longer than one year." §39.001(1)(h), Florida Statutes (2018). Here, seven years transpired between the children first being sheltered and the trial court's termination of the mother's parental rights. The Department of Children and Families ("DCF") proved two statutory bases for termination of the parents' rights, and that termination was in the children's best interests. Competent substantial evidence supports those findings. I would affirm.

This is a case where, despite the mother's completion of the tasks in her case plan, she was not in "substantial compliance" because her conduct remained unchanged. She was still subject to, and involved in, domestic violence, continued to have anger management problems, and was unable to provide safe, stable housing for her children. She demonstrated that continued involvement placed the children at risk. The children, ages 9, 7, and 4, had spent most of their lives in the custody of other relatives. The children deserve permanency, and that is just what the trial court provided for them.

The two oldest children were sheltered with the maternal great-grandmother in May 2012 when the mother was arrested for testing positive for marijuana in violation of her community control. The children were two years and one year old at the time. The third child was born in July 2014, and initially remained in her parents' care.

- 13 -

Three years later, in early 2015, the two older children were reunified with the parents. They were five and four years old at that time. In June 2015, shortly after reunification, the parents fell behind on their rent. They obtained a loan from their church pastor to pay the rent conditioned upon the parents preparing a budget. Two months later, the parents once again fell behind on their rent and were ultimately evicted from their apartment.

In August 2015, the guardian ad litem conducted an unannounced visit because the parents had not returned her call to coordinate a home visit. The guardian found an unscreened person watching the children. The apartment was in deplorable condition. She saw bugs and maggots; raw garbage was strewn throughout the apartment; and dirty dishes were found in the kitchen sink and on the floor.

The two oldest children were again removed from their parents, and their younger sibling was removed a year later. They had not lived with their parents for most of their lives. They had been in the care of relatives for over five years.

In November 2015, the mother had an angry outburst and kicked a door in the courtroom. The trial court ordered her to individual counseling with an anger management component. In December 2015, the mother ended her relationship with the father. On January 1, 2016, the mother and father's apartment was once again found to be in deplorable condition. An officer saw roaches in the apartment. There were dirty dishes everywhere and little food was found in the apartment. Clothes were found on the bathroom floor, next to the bathtub where the mother had poured bleach all over the father's clothing.

In February 2016, there was another domestic violence incident between the parents. The mother had gone to the paternal grandmother's home to drop off laundry. The father then attacked the mother. The mother called the police, the child advocate, the guardian ad litem, and obtained a restraining order.

The mother had another angry outburst in court in November 2016. By then, the maternal great-grandmother was no longer willing to have the children placed with her due to problems with the parents.

In January 2017, a third domestic violence incident occurred. The father stole the mother's money and phone. He also stole the mother's car. The mother jumped in the back of the car, placing herself at risk of harm. The mother subsequently called the police, guardian ad litem, and

child advocate. She sought a restraining order. However, she had not followed lessons she was taught in her domestic violence classes.

In June 2017, the mother was arrested for resisting without violence and driving with a suspended license. In November 2017, the mother was cited for speeding and for again driving with a suspended license.

The DCF petitioned for termination of their parental rights.[4] The DCF alleged as grounds for termination:

(1)     "the parents engaged in conduct toward the child or toward other children that demonstrate[d] that the continuing involvement of the parent or parents in the parent-child relationship threaten[ed] the life, safety, well-being, or physical, mental, or emotional health of the child irrespective of the provision of services."

and

(2)     the children "ha[d] been adjudicated dependent, a case plan has been filed with the court, and: [t]he child[ren] ha[d] been in care for any 12 of the last 22 months and the parents ha[d] not substantially complied with the case plan . . . ."

§§ 39.806(1)(c) and (e)(3), Fla. Stat. (2019).

Because the evidence supported both grounds, I would affirm. *See R.S. v. Dep't of Children & Families,* 872 So. 2d 412, 413 (Fla. 4th DCA 2004).

- ***Conduct Demonstrating That Continuing Involvement Threatens the Children's Well-Being.***

To terminate parental rights under section 39.806(1)(c), Florida Statutes, the trial court must find that the parent engaged in conduct toward the child that demonstrates the parents' continuing involvement threatens the life, safety, well-being, or physical, mental or emotional health of the child. That requires the trial court to find that "any provision of services would be futile or that the child would be threatened with harm despite any services provided to the parent." *D.B. v. Dep't of Children and Families,* 87 So. 3d 1279, 1286 (Fla. 4th DCA 2012) (internal citations omitted).

---

[4] The Guardian ad Litem Program joined the petition a year later.

The mother's case plan tasks included parenting classes, random drug screens, individual counseling with a focus on decision-making and child safety, and couples counseling. She was provided a life coach and individual counseling with an anger management component, co-parenting classes, and domestic violence classes for victims. The mother voluntarily completed a substance abuse evaluation, outpatient treatment, batterer's intervention, and a psychological evaluation concerning her ability to parent.

Yet, after completing these tasks, she continued to make poor decisions and demonstrated lack of insight into the reasons why her children were sheltered. Her conduct of neglecting the children that reappeared following provision of services established the likely risk of future harm to the children with "no reasonable basis to conclude [her] past behaviors [would] improve." *Id. at* 1282.

An officer testified that he was called to the mother's home for police standby in January 2016 because the father had changed the locks after an earlier verbal altercation. Upon entering the home, the officer observed dozens of roaches crawling up the walls and across the floor. The sink was overflowing with dirty dishes. The trash had soiled food inside with no liner in place. The refrigerator contained only a few food items and there was some type of liquid spilt all over it. A pile of clothes was observed by the bathtub. The mother reported pouring bleach on the father's clothes during their earlier verbal altercation.

In November 2016, she had another angry outburst in court. In January 2017, she was involved in another domestic violence incident with the father. In June 2017, the mother was arrested for driving with a suspended license and resisting/failing to obey a command. The arresting officer testified that the mother refused to get back into her car when ordered and was "belligerent."

A history of domestic violence supports a finding of prospective harm. *C.J. v. Dep't of Children & Families*, 968 So. 2d 121, 125 (Fla. 4th DCA 2007). The trial court does not have to wait for a child to be injured before it may terminate parental rights to protect the child. *In re: J.L.P.,* 416 So. 2d 1250 (Fla. 4th DCA 1982).

The parents were each offered case plans. The father never complied, and a default was entered against him. While the mother initially failed to comply, she ultimately completed her tasks in the case plan. Nevertheless, her troublesome conduct remained unaltered. Approximately eight

months after the mother completed her tasks, another act of domestic violence occurred in which the father choked the mother to the point of unconsciousness.

The evidence established that continuing the parent-child relationship with the mother threatened the life, safety, health and emotional and physical well-being of the children.  This threat was not remedied by the mother's completion of her case plan tasks.  And, the evidence supports the trial court's finding that continuing to offer services would be futile.

- *Lack of Substantial Compliance with the Case Plan*

The DCF also proved the mother had not substantially complied with the case plan even though she had completed her tasks.[5]  *W.S. v. Dep't of Children & Families*, 961 So. 2d 1131, 1132 (Fla. 4th DCA 2009).

Where the issue is whether a child should be reunited with a parent, section 39.522(2) provides:

> the court shall review the conditions for return and determine whether the circumstances that caused the out-of-home placement and issues subsequently identified have been remedied to the extent that the return of the child to the home with an in-home safety plan prepared or approved by the department will not be detrimental to the child's safety, well-being, and physical, mental, and emotional health.

§ 39.522(2), Fla. Stat. (2018).

Here, the children were sheltered twice due to hazardous, deplorable living conditions in the home.  The mother continued to exhibit poor judgment and anger management problems even after completing services designed to address these issues.  And although the mother purportedly ended her relationship with the father, they continued to engage in domestic violence, which placed the children at substantial risk of harm.

Mere completion of services is not equivalent to substantial compliance with a case plan.  *C.B. v. Dep't of Children & Families*, 257 So. 3d 1078, 1081 (Fla. 4th DCA 2018); *see A.B.E.*, 47 So. 3d 347, 351; *J.J. v. Dep't of*

---

[5] The second ground was tried by consent.  *See K.S. v. Dep't of Children & Families*, 940 So. 2d 577, 578 (Fla. 5th DCA 2006).  While the children had not yet been in out-of-home care for 12 of the last 22 months, the issue was fully argued by counsel.

*Children and Families*, 886 So. 2d 1046, 1048-1049 (Fla. 4th DCA 2004). "'Substantial compliance' means that the circumstances which caused the creation of the case plan have been significantly remedied to the extent that the well-being and safety of the child will not be endangered upon the child's . . . being returned to the child's parent." § 39.01(84) Fla. Stat. (2018).

The trial court thoughtfully considered all the relevant testimony and factors enumerated in section 39.810, Florida Statutes. The court made findings on all eleven factors and found that termination was in the children's manifest best interests. Competent substantial evidence supported those findings. *J.P. v. Dep't of Children & Families*, 183 So. 3d 1198, 1204 (Fla. 1st DCA 2016).

The evidence proved the children cannot be safely reunited with the mother. "While the parents have a right to raise their child, it is a right they may forfeit by their conduct. The child[ren], too, ha[ve] a right to achieve stability in [their] [lives] with parents who will properly care for [them]." *D.G. v. Dep't of Children & Families,* 77 So. 3d 201, 210.

The children are placed with their maternal great-grandmother, who is willing to adopt them. The two oldest children have no special medical needs, but the youngest child does. The maternal great-grandmother cares for those medical needs and the needs of the other children. These children can form a significant bond with their parental substitute. They will be in a more stable and permanent living arrangement. They look to her as a parental figure. They have a good relationship.

As the trial court order stated:

The children are deserving of permanency at this point. The children deserve to be in a stable and secure home. The maternal great grandmother can provide a stable and secure home for the children. The maternal great grandmother can meet all of the children's needs.

The mother and father love their children, but they do not have the ability or disposition to safely take care of their children on a daily basis given a lack of case plan compliance (lack of insight gained) and the continuing involvement of the mother and father in the parent child relationship threatens the life, safety, well-being, or physical, mental, or emotional health of the children irrespective of services. The children deserve more at this point than a life in limbo.

The majority suggests however that the evidence does not support the trial court's findings. I disagree. While the mother completed her tasks, she did not alter her behavior. By relying on the completion of the tasks and not the resulting behavior, the majority puts form over substance.

The critical issue here was the children's best interests and insuring they were not at continued risk of harm. These children have spent most of their lives with their maternal great-grandmother. Why? Because the mother, despite services offered and completed, was unable to provide a safe, stable living environment for them.

The majority also relies on the restraining orders obtained by the mother as evidence of her improved behavior, but then fails to acknowledge that she asked to have at least one of them dissolved. The majority also relies on the amount of time between the facts giving rise to the termination and the order itself. I prefer to rely on the seven years the DCF and the court supervised this family to try to reunify them, a time far longer than the goal of one year to permanency.

The court properly adjudicated the children dependent, terminated their parents' rights, and committed them to the DCF for subsequent adoption, which was the least restrictive means of protecting the children from harm. *See S.M. v. Dep't of Children and Families,* 202 So. 3d 769 (Fla. 2016). I would affirm.

*         *         *

***Not final until disposition of timely filed motion for rehearing.***