# Third District Court of Appeal

## State of Florida

Opinion filed January 14, 2026.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D24-2320
Lower Tribunal No. D21-15038 TP
_____


**A.B., the Father,**
Appellant,

vs.

**Department of Children and Families, et al.,**
Appellees.


An Appeal from the Circuit Court for Miami-Dade County, Denise Martinez-Scanziani, Judge.

Joyce Law, P.A., and Richard F. Joyce, for appellant.

Karla Perkins, for appellee Department of Children and Families; Sara Elizabeth Goldfarb, Statewide Director of Appeals, and Laura J. Lee, Assistant Director of Appeals (Tallahassee), for appellee Guardian ad Litem; Glass Law Office, P.A., and Lisa Paige Glass (Boca Raton), for appellees W.V. and D.B., Foster Parents.


Before EMAS, GORDO and LOBREE, JJ.

PER CURIAM.

A.B., the Father ("Father"), seeks to reverse the amended final judgment terminating his parental rights to the child ("C.B.") on grounds of abandonment, pursuant to sections 39.01(1) and 39.806(1)(b), Florida Statutes (2023). We have jurisdiction. Fla. R. App. P. 9.030(b)(1)(A). We affirm.

## BACKGROUND

C.B. was born prematurely in January 2021 to a drug-dependent Mother. The Mother indicated that A.B. was the father. When the Department of Children and Families ("the Department") contacted him, he denied paternity and informed the Department he was not interested in finding out if he was the father. When C.B. was five weeks old, the Department petitioned to shelter C.B. when the Mother entered residential treatment. Although advised of the shelter hearing, the Father did not attend. C.B. was sheltered with the Foster Parents, who have cared for him since. The trial court subsequently adjudicated C.B. dependent as to the Mother. The Mother eventually failed to comply with her reunification case plan and the Department filed a petition for termination of parental rights as to the Mother.

Several months later, the Father appeared for the first time at the

termination status hearing via Zoom and alleged he was the biological father. The Father attributed his delay in responding to the Department's notices to his work schedule and admitted he really did not consider C.B.'s welfare. The trial court ordered the Father to submit to a paternity test, which confirmed his paternity of C.B. At the next hearing, the Father sought visitation, but because he lives in Georgia, the trial court ordered virtual visitation with the Foster Parents supervising. The Father briefly traveled to Florida and had two in-person visits with C.B. with each visit lasting one hour.

Soon thereafter, the Father advised the trial court that he was relocating to his uncle's Boynton Beach home in order to be more readily available to have in-person visits with C.B. The trial court modified visitation and additionally ordered an out-of-county home study at the Father's request. The Father failed to supply the necessary documents, and the home study process was closed in October 2022. The Father moved back to Georgia. Pursuant to the Father's financial affidavit, the trial court ordered the Father to pay $521.64 each month for child support, beginning on June 15, 2022. Despite being represented by counsel, the Father claimed he could not determine how to make payments. It was not until ten months later, in April 2023, that the Father made his first and only child support payment of $1,056, which he mailed to the Foster Parents' counsel.

3

The Foster Parents then filed a petition for termination of both parents' rights, alleging abandonment as the sole ground for the Father's termination.[1] As to the Father, the Foster Parents cited the Father's absence during the first year of C.B.'s life and his failure to express any interest in supporting or parenting C.B. since the Father's paternity was established.

Following the trial on termination, at which the Father, the Guardian ad Litem, the Department, and the Foster Parents testified, the trial court entered a Final Judgment of Termination of Parental Rights and Disposition as to both the Mother and the Father. Regarding the Father, the trial court

---

[1] Section 39.01(1), Florida Statutes, in relevant part, defines abandonment as follows:

> "Abandoned" or "abandonment" means a situation in which the parent or legal custodian of a child . . . , while being able, has made no significant contribution to the child's care and maintenance or has failed to establish or maintain a substantial and positive relationship with the child, or both. For purposes of this subsection, "establish or maintain a substantial and positive relationship" includes, but is not limited to, frequent and regular contact with the child through frequent and regular visitation or frequent and regular communication to or with the child, and the exercise of parental rights and responsibilities. Marginal efforts and incidental or token visits or communications are not sufficient to establish or maintain a substantial and positive relationship with a child. A man's acknowledgment of paternity of the child does not limit the period of time considered in determining whether the child was abandoned.

§ 39.01(1). Fla. Stat. (2023).

determined that substantial and competent evidence supported the conclusion that the Father abandoned C.B. by failing to make a significant contribution to C.B.'s care and maintenance while being able to, and by failing to establish or maintain a substantial and positive relationship with C.B. The trial court further determined that the Father lacks the capacity to care for C.B. to the extent that C.B.'s safety, well-being, and physical, mental, and emotional health would be endangered upon C.B.'s return to Father. The court found the Father's testimony lacked credibility, that he offered inconsistent explanations as to why he waited until C.B. was almost one year old to step forward as C.B.'s father. The trial court determined that termination was in C.B.'s best interest, noting that in the nearly five years since C.B.'s birth, C.B. had developed a strong parent-child bond with the Foster Parents. This appeal follows.

## STANDARD OF REVIEW

We review a final judgment terminating parental rights to determine whether the trial court's finding that there is clear and convincing evidence to terminate parental rights is supported by competent, substantial evidence. V.S. v. Dep't of Child. & Fams., 322 So. 3d 1153, 1159 (Fla. 4th DCA 2021). Further, our appellate review of the trial court's best interests determination is highly deferential in a termination of parental rights action. See Dep't of

5

Child. & Fams. v. L.W., 393 So. 3d 758, 763 (Fla. 3d DCA 2024).

## ANALYSIS

Before a trial court can terminate a parent's rights to his or her child, there are three elements the Department must prove. First, the Department must prove by clear and convincing evidence that at least one statutory ground in section 39.806(1), Florida Statutes (2023), exists. See § 39.806(1), Fla. Stat. (2023); § 39.809(1), Fla. Stat. (2023) ("In a hearing on a petition for termination of parental rights, the court shall consider the elements required for termination. Each of these elements must be established by clear and convincing evidence before the petition is granted."). Second, the Department must show that termination is in C.B.'s manifest best interests. See § 39.810, Fla. Stat. (2023) ("In a hearing on a petition for termination of parental rights, the court shall consider the manifest best interests of the child."). And third, the Department must demonstrate that termination is the least restrictive means of protecting C.B. from serious harm. See Padgett v. Dep't of Health & Rehab. Servs., 577 So. 2d 565, 571 (Fla. 1991) ("[B]ecause parental rights constitute a fundamental liberty interest, the state must establish in each case that termination of those rights is the least restrictive means of protecting the child from serious harm."). We note that the protections of due process do not require the Department to

6

exhaust every possible service that could remotely help a parent; rather, the protection simply requires the Department to employ "fundamentally fair procedures" prior to seeking termination. Santosky v. Kramer, 455 U.S. 745, 753–54 (1982).

Here, there is competent, substantial evidence in the record supporting the determination that fundamentally fair procedures were employed. The record contains competent substantial evidence that termination is the least restrictive means of protecting C.B. from harm. That harm includes removing C.B. from a loving environment and the only caretakers he has known for the nearly five years of his life, failing to maintain C.B.'s various medical and social therapies, and inconsistent parental care leading to reversals of C.B.'s progress in all areas of life. See K.D. v. Dep't of Child. & Fams., 242 So. 3d 522, 523 (Fla. 1st DCA 2018) ("Our review, confined to the least restrictive means prong of the termination order, is 'highly deferential' and limited to whether competent, substantial evidence supports the trial court's judgment and whether we "'cannot say that no one could reasonably find such evidence to be clear and convincing."'" (quoting J.P. v Fla. Dep't of Child. & Fams., 183 So. 3d 1198, 1203 (Fla. 1st DCA 2016))). To that point, the record reflects that C.B. was sheltered soon after birth and has never lived with the Father or interacted with him on a regular basis. The Father

inconsistently and infrequently visited with C.B., mostly by virtual visits, and made a one-time child support payment, although able to pay child support. The Guardian ad Litem observed that C.B. and the Father do not share a parent-child bond, and that the Father is unprepared to deal with C.B.'s ongoing medical and social therapies or day-to-day care. See, e.g., Statewide Guardian ad Litem Off. v. C.C., 382 So. 3d 614, 620 (Fla. 2024) (finding the evidence undisputed that the Father has no parent-child bond as a result of only minimal efforts to engage with and care for his son). On the other hand, C.B. has spent the years since his birth with the Foster Parents who have provided for all his medical, developmental, and social needs, and the record reflects that C.B. has formed a strong parent-child bond with the Foster Parents. The least restrictive means test "is not intended to preserve a parental bond at the cost of a child's future." S.M. v. Fla. Dep't of Child. & Fams., 202 So. 3d 769, 778 (Fla. 2016). "Where there is little or no bond to protect and there was never a parent/child relationship to re-establish, termination of parental rights is not barred by the application of the least restrictive means test." F.L.C. v. G.C., 24 So. 3d 669, 671 (Fla. 5th DCA 2009).

The Father's decision to remain in Georgia is further competent, substantial evidence supporting the trial court's conclusion that termination

8

is the least restrictive means. "The test is not whether, under controlled circumstances, a parent can have contact with the child and develop an emotional bond, but whether a mother or father can be a parent to the child, with all of the responsibility and care that entails." S.M. v. Dep't of Child. & Fams., 190 So. 3d 125, 129 (Fla. 4th DCA 2015). For that reason, "[i]f reunification is not possible because the father or mother cannot or will not assume responsibility as a parent to the child, . . . then termination is the least restrictive means of preventing harm." Id.

The record similarly contains clear and convincing evidence that termination of the Father's parental rights is in C.B.'s manifest best interests. The Father was inconsistent in visiting C.B., chose to avoid contact for ten months after C.B.'s birth, chose not to show a parental interest in C.B.'s well-being by his lack of interest in C.B.'s schooling, therapies, and social development, missing scheduled appointments, and failed to consistently provide financial support despite having that ability. "Marginal efforts and incidental or token visits or communications" are insufficient. § 39.01(1), Fla. Stat. (2023). The Foster Parents, who have been caring for C.B. for nearly five years, provided detailed evidence of meeting C.B.'s various social, developmental, and medical needs. The record shows that C.B. has established a strong parent-child relationship with the Foster Parents, the

9

only parents he has ever known. It is likely that C.B. will be adopted into the Foster Parents' stable home environment as a result of termination of the parents' parental rights and duties. See V.J. v. Dep't of Child. & Fam. Servs., 949 So. 2d 1128, 1129–30 (Fla. 3d DCA 2007) ("The trial court found that the evidence showed [the biological father] 'has never had any type of relationship with [L.C.]' and that 'any efforts [the biological father] has made have been marginal at best and do not evince a settled purpose to assume parental responsibilities.' Because a review of the trial transcript demonstrates that this conclusion was supported by clear and convincing evidence, we must affirm. . . . The [biological father] would separate five and a half year old L.C. from the only people who have loved her as parents and ultimately place her in the hands of a biological father who has demonstrated no interest in L.C. during the vast majority of her young life, and is presently unable to provide adequate care . . . . "); § 39.810(7), Fla. Stat. (2023).

The trial court made full findings on all eleven statutory factors and found that overall, termination of the Father's parental rights was in C.B.'s manifest best interest and the least restrictive means of preserving C.B.'s safety and well-being, while affording the Father due process protections. C.C., 382 So. 3d at 621; J.P., 183 So. 3d at 1204 (where the trial court made full findings on all eleven statutory factors and found that, overall, termination

10

of parental rights was in the child's manifest best interest, the appellate court should not re-weigh the evidence). The trial court's clear and convincing findings were sufficient for appellate review, and there is competent, substantial record evidence to support affirmance. The remaining issues on appeal are without merit.

Affirmed.